## STATE OF CONNECTICUT v. LARRY FRAZIER

SPEZIALE, PARSKEY, SHEA, ASPELL and F. HENNESSY, Js.

Argued May 5—decision released August 11, 1981

212

*Jerrold H. Barnett,* public defender, with whom was *Clement F. Naples,* deputy chief public defender, for the appellant (defendant).

*Donald A. Browne,* state's attorney, for the appellee (state).

SHEA, J. The defendant was found guilty by a jury on all counts of a thirteen-count information charging him with rape in the first degree (four counts) in violation of General Statutes § 53a-72 (a) (1);[1] deviate sexual intercourse in the first degree (three counts) in violation of General Statutes § 53a-75 (a) (1);[2] burglary in the first first degree (one count) in violation of General Statutes § 53a-101 (a) (1); larceny in the first degree (one count) in violation of General Statutes §§ 53a-119 and 53a-122 (a) (2); and unlawful restraint in the first degree (four counts) in violation of General Statutes § 53a-95 (a). In his appeal from the judgment of conviction the defendant raised four issues in his original brief: (1)

[1] General Statutes § 53a-72 was repealed by Public Acts 1975, No. 75-619, § 7.

[2] General Statutes § 53a-75 was repealed by Public Acts 1975, No. 75-619, § 7.

whether his rights of trial by jury and of equal protection of the laws were infringed because the array of prospective jurors available for selection of the trial jury was allegedly not composed of a fair cross-section of the community; (2) whether certain statements of the defendant admitted in evidence were obtained in violation of the principles of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (3) whether the court should have given a curative instruction or followed some other procedure to minimize the possible prejudice which may have been caused by an objectionable question asked by the prosecutor; and (4) whether some of the crimes charged in the information, which all arose out of the same incident, were merged. The defendant also raised a fifth issue in a supplemental brief which he filed, whether his right to a fair and public trial was violated by the order of the court excluding the public during the testimony of the victim of the sexual assaults.

The defendant does not question the sufficiency of the evidence to support the guilty verdicts. Our summary of the facts relating to the commission of the crimes which the jury might reasonably have found is abbreviated accordingly.

On Sunday, November 17, 1974, at about 11 a.m. the victim of the sexual assaults, her husband and their two young children returned to their home in Westport after attending church services. When the family entered the kitchen they were confronted by the defendant who was pointing a rifle at them. He directed the four members of the family to lie face down on the kitchen floor and caused their hands to be tied behind their backs. He removed the wallet of the husband from a pocket of his pants.

Threatening the others not to move, he ordered the wife to go with him to an upstairs bedroom. There he committed various sexual assaults upon her as charged in the information. The defendant then went downstairs to the kitchen where he proceeded to place the two young children inside a kitchen closet. He returned to the bedroom upstairs and again sexually assaulted the wife. After binding her hands and feet once more, he went back to the kitchen and requested the keys of the car from the husband. The defendant then started the automobile, but he returned to the house and attempted to place a telephone call. He also proceeded to take various items from the dining and living rooms, filling a pillow case with some of the objects and placing it on the kitchen floor. He again went upstairs to the bedroom and committed another series of sexual assaults upon the victim. He also removed from her person two rings and a necklace. He returned to the kitchen where he picked up the pillow case and proceeded to leave the driveway in the car belonging to the family.

The husband was able to free himself soon after the defendant left. He untied his wife and children and then called the police. A Westport police officer who was sent in response to the call observed a man, whose description corresponded to that he had received, just starting to drive a car away from the curb of a street near the home of the complainant. When the officer followed, the other vehicle turned into a driveway and the defendant got out and started to run. The officer pursued him across several properties along the shoreline until the defendant entered the water, where he remained until other police officers arrived and took him into custody.

A blue suit jacket belonging to the husband, which the defendant wore as he exited the car but discarded during the chase, was retrieved. A gasoline can taken from the residence was found in the car he had been seen operating. The family automobile, containing numerous items taken from the house, was found abandoned about one-tenth of a mile from where the officer had observed the defendant starting to drive his car away from the curb.

## I

On the morning assigned for the commencement of the selection of the trial jury a new group of jurors was scheduled to begin service at the Fairfield County courthouse in Bridgeport. Of those summoned, many of whom were excused without coming to the courthouse for medical reasons, 189 appeared and went through the usual indoctrination procedure. An additional 77 persons were excused during this process, leaving 112 potential jurors available for service in criminal trials.

The defendant's attorney, after observing the group of jurors available for service, raised a claim that the small number of black persons he saw was an indication of discrimination which would be prejudicial to the defendant, a black man. The trial judge allowed the defendant some time to investigate the matter further.

The next day the defendant filed a motion to "quash and/or strike the jury panel" on the ground that there had been systematic exclusion of black people from "the list of prospective jurors from which the present panel was drawn" in violation of his rights to equal protection and due process of law under the federal and state constitutions. A

hearing was held upon the motion at which the jury clerk testified that, of the 112 prospective jurors available for criminal trials, seven or 6.28 percent appeared to be black. Copies of the 1970 census data for each municipality in Fairfield County were also submitted. From these exhibits the trial court made certain findings by arithmetical computation but failed to make others which the defendant sought in his draft finding.[3] We need not discuss the corrections in the finding which the defendant requests in this appeal because he does not claim that the slight difference between the 6.28 percent representation of blacks on the jury array available for the trial of his case and the 7.1 percent black composition of Fairfield County, as found by the trial court, has any significance.

Except for inferences which the defendant seeks to draw from the statistical data, there is no evidence of purposeful discrimination on the part of officials in charge of compiling the jury list or summoning those selected. The defendant claims to have made out a prima facie case of a violation of the requirement that juries be drawn from a fair cross-section of the community in accordance with the standards established for statistical proof of such a claim in *Duren* v. *Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected

---

[3] This appeal was filed on August 5, 1976 and the finding was filed on December 19, 1978. The applicable rules of appellate procedure are those in effect prior to July 1, 1979 when the draft finding and the post-decision finding were eliminated. Practice Book § 3166.

is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process." Id., 364.

It cannot be doubted that the first of these criteria has been fulfilled. Black people are a classic example of a "distinctive" group as has been held for more than a century. *Strauder* v. *West Virginia,* 100 U.S. 303, 305, 25 L. Ed. 664 (1880) ; see *Hernandez* v. *Texas,* 347 U.S. 475, 477–480, 74 S. Ct. 667, 98 L. Ed. 866 (1954).

The defendant appears to recognize that his challenge to the jury array founders on the second requirement, that the defendant show a significant disparity in the proportion of blacks on the panel under scrutiny as compared to the general population of Fairfield County. Attributing no significance to the .85 percent differential between these percentages, the defendant now seeks to eliminate from the computation those towns in which black people form only a minuscule portion of the population. In effect, he claims that a black defendant is entitled to a jury array drawn from only those municipalities which have a substantial black population. This claim was not raised at trial but, since it has constitutional ramifications and the census data upon which it is based is not disputed, we may consider it. *State* v. *Evans,* 165 Conn. 61, 69–70, 327 A.2d 576 (1973). "From time immemorial in this state, the community unit which is the basis for the source of a jury array is that of a county, in this instance, Fairfield County." *State* v. *Townsend,* 167 Conn. 539, 551, 356 A.2d 125 (1975). We are not aware of any authority holding that some nar-

rower political unit where particular minorities
might have greater proportionate strength must be
used as the "community" to which the fair cross-
section standard should be applied. It is not claimed
that there has been any manipulation of political
boundaries designed to minimize the representa-
tion of black people on juries. See *White* v.
*Regester,* 412 U.S. 755, 765–770, 93 S. Ct. 2332, 37
L. Ed. 2d 314 (1973). Absent such an invidious pur-
pose, there can be no violation of the equal protec-
tion clause simply because the viewpoint of a par-
ticular group might find more effective expression
if the political unit used as the source of a jury
array were differently constituted. *Mobile* v.
*Bolden,* 446 U.S. 55, 70–71, 100 S. Ct. 1490, 64 L.
Ed. 2d 47 (1980).

We need discuss the third requirement of a "sys-
tematic" exclusion of the particular group only to
observe that the defendant's presentation, which
was based only upon the composition of a single
jury array available for service for the ensuing four
weeks, would hardly establish that any dispropor-
tion, even if significant, was systematic. See *Duren*
v. *Missouri,* supra, 366.

We conclude that the defendant has failed to
prove a prima facie violation of the fair cross-
section requirement with respect to the array from
which the trial jury was selected in accordance with
the standards established in *Duren* v. *Missouri,*
supra, 364. Aside from the statistical data, which
we find deficient, there is no evidence of actual dis-
criminatory intent, which might otherwise support
his claim of a violation of his right to equal protec-
tion. *Cassell* v. *Texas,* 339 U.S. 282, 286–90, 70
S. Ct. 629, 94 L. Ed. 839 (1950).

## II

In claiming that certain inculpatory statements made to the police officers were improperly admitted into evidence at the trial because of the failure to comply with *Miranda* v. *Arizona,* supra, the defendant focuses mainly upon the requirement of an effective waiver of his constitutional rights prior to questioning. He claims no deficiency in the giving of the specified warning or in his comprehension of it. See *State* v. *Wilson,* 183 Conn. 280, 285n, 439 A.2d 330 (1981). "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda* v. *Arizona,* supra, 475. The issue is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. *Culombe* v. *Connecticut,* 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961).

There can be little dispute about the circumstances leading to the incriminating statements of the defendant which were admitted in evidence. Most of what transpired was tape recorded, unbeknownst to the defendant. The remainder appears to be uncontradicted. The trial court's finding omitted many of the requests[4] in the defendant's

---

[4] Most of these requests were properly omitted as mere recitals of testimony. A finding was never intended to be a regurgitation of the transcript. Practice Book, 1963, § 612C.

draft finding which are supported by the transcript of the tape. In our consideration of this appeal the defendant has been given the benefit of these omissions.

At the time the defendant was captured near the beach in Saugatuck a Westport police officer advised him of his constitutional rights by reading a card which he carried containing the familiar *Miranda* warning. The defendant said he was aware of his rights and had heard them before, a statement supported by his later testimony during the hearing on the admissibility of his conversation with police that he had been convicted of several felony offenses in the period 1968-1975. When the defendant was taken to the Westport police station, another officer again read the *Miranda* warning to him. The defendant responded that he understood his rights and had been advised of them before. He was then formally arrested and charged with robbery and rape.

The defendant was brought upstairs to a room in the detective bureau. He was allowed to remove his handcuffs and wet clothes and was given some dry coveralls to wear. A tape recorder in the room had been placed in operation just before the defendant's entrance, a circumstance of which the defendant was unaware. Two detectives, Smith and D'Aiuto, sat at the rear of a desk and the defendant sat in front. The police chief sat at another desk in the room.

The defendant was permitted to make a telephone call to his home prior to any questioning. The tape recorder picked up his part of the conversation with

a member of his family, presumably his sister.[5] Although the transcript of this portion of the tape is not entirely coherent, the defendant indicated that the Westport police were holding him for robbery and other charges and were trying to accuse him of rape; that he had been using his mother's car, which the police had in their possession; that any bond would be extremely high; that the police wanted him to confess and he had nothing to lose; and that he wanted to see that the car was returned to his mother. He asked for some clothes to be brought to him and that his mother be told he was sorry. He concluded the conversation by saying, "yea, but you ain't ashamed but you ain't got to do the time that I gots to do . . . I'm the one that's gonna feel bad."

After the telephone conversation, detective D'Aiuto asked the defendant if he wanted to tell what happened and to start with his car stopping on the road. The defendant responded, "[u]h, my car stopped . . . uh . . . I ain't signing no statements." The officer then told him that if he did not want to sign a statement he would not have to sign a statement, and he inquired whether the defendant had been read his rights at the scene. The defendant replied affirmatively but said that he had not signed the back of the card given to him by the officer. He was then asked to sign a waiver form, the *Miranda* warning contained thereon being read to him and the paper being handed to him to read and fill out. When the defendant said he could not read, officer D'Aiuto began to read aloud each part of the warn-

---

[5] The defendant addressed the person he spoke to on the telephone as "Sissy."

ing, requesting the defendant to initial the blank space provided on the form after each of the warning paragraphs.

After he heard the paragraph read stating that if he talked to any police officer anything that he said could and would be used against him and was requested to initial it, the defendant said "I'm not saying that . . . not that is I talked to any police officer." D'Aiuto then explained that by initialing this paragraph the defendant would not be indicating that he had said anything but merely that the paragraph had been read to him. The defendant then initialed the paragraph and continued to initial the remaining paragraphs of the form as they were read to him.

The last paragraph of the form was an addition to the standard warning requirements of *Miranda,* and it stated: "I am willing to answer questions and make a statement knowing that I have these rights. I do not want a lawyer at this time. I know and understand what I am doing. I do this freely and voluntarily, and no threats or promises have been made to me." When this paragraph was read to him the defendant said, "Uh, this here . . . relates to a statement. I'm not gonna to write no, I'm not gonna give no sworn statement." D'Aiuto replied, "No. No. No. I know you're not. All that this is is a waiver of your rights, so that, in the event you're gonna, you said you're going to tell me what happened, isn't that right? I don't even want to know what happened unless you put it, unless you sign, sign here your legal signature." The defendant did initial this paragraph and also signed his name on another line just below. Beneath that part of the form was a blank space headed by the word "statement" in which nothing appears.

The tape indicates that as soon as the waiver form had been initialed and signed by the defendant, officer D'Aiuto began to question the defendant.

The defendant readily admitted that he had taken his mother's car without permission, that it had run out of gas on Saugatuck Avenue in Westport, and that he decided then to burglarize a house which he came upon not very far from where he had parked the car. The family came home while he was so engaged. He pretended to have a weapon when they found him in the house. He said he had tied them up, leaving the man in the kitchen, putting the children in the closet, and bringing the woman to the bedroom upstairs. He denied any sexual advances of any kind and also denied possession of any weapon. He admitted taking the car which he had loaded with various items found in the house, and also the gas can, which he had used to replenish the tank of the car he had been driving. Before the conversation was concluded he discovered that the tape recorder was in operation, at which point he said he had made up the whole story of his involvement. The entire recording on the tape took fifty-seven minutes.

Although the defendant in his brief alludes to the tactic used by the police of recording their interview with him without his knowledge, he does not challenge the legality of this practice which has often received judicial sanction. *Lopez* v. *United States,* 373 U.S. 427, 439, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963); *Lee* v. *Wilson,* 363 F.2d 824 (9th Cir. 1966); *State* v. *Lorain,* 141 Conn. 694, 700–701, 109 A.2d 504 (1954).

The defendant first points to some discrepancies between the tape recording of the conversation and

the testimony of some of the police officers concerning their recollection of it, claiming that these inconsistencies flaw their testimony. Detectives D'Aiuto and Smith before the tape was played said they did not think the defendant had told them he was illiterate as the tape recording demonstrates he did. These misstatements on their part were not prejudicial to the defendant, however, because the trial court found that the defendant had informed the officers that he could not read.

The defendant relies mainly upon his claim that some of his responses during the conversation about the waiver indicated that he did not want to be questioned and that the police, therefore, should have discontinued the interview. "Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Miranda* v. *Arizona,* supra, 445. "There can be no doubt that, if the accused indicates in some way that he wishes questioning to cease, the interrogation must end." *State* v. *Cobbs,* 164 Conn. 402, 418, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973). The defendant refers to his remark at the start of the interview before the waiver form was read to him that "I ain't signing no statements." Another declaration: "I'm not saying that . . . not that is I talked to any police officer," which followed a request to initial the warning paragraph, beginning: "If I talk to any police officer, . . ." is also mentioned, but this portion of the colloquy indicated simply a misunderstanding on the part of the defendant of the significance of that paragraph, which the officer then proceeded to clarify in an appropriate manner. He also relies upon his response after the express waiver paragraph of the form was read to him that

he was not going to write or give any sworn statement. We think a fair interpretation of these comments of the defendant is that he was refusing to make any written statement concerning the crimes but that he had no reluctance to discuss them orally with the officers, at least until his discovery of the tape recorder. His telephone conversation with his sister prior to any questions indicates some desire on his part to cooperate with the police for the purpose of obtaining the release of his mother's car from police custody[6] and his realization that he had nothing to lose in view of the overwhelming evidence against him with respect to some of the charges.

It has frequently been held that a refusal to give a written statement does not amount to an assertion of the constitutional right to remain silent. *United States* v. *Cooper,* 499 F.2d 1060, 1062 (D.C. Cir. 1974); *Pettyjohn* v. *United States,* 419 F.2d 651, 655 (D.C. Cir. 1969), cert. denied, 397 U.S. 1058, 90 S. Ct. 1383, 25 L. Ed. 2d 676 (1970). "It is, we think, a common experience of life that in many circumstances persons are willing to convey information orally but are reluctant to put the same thing in writing." *United States* v. *Cooper,* supra. This defendant's unwillingness to give a written statement is quite understandable in view of his inability to read.

Even if the defendant's remarks were to be construed as a negation of his act of initialing the express waiver paragraph of the form, it is clear that an express waiver, either oral or written, is not

---

[6] The defendant made no claim that the police made promises of any kind to him. He did say that they threatened to kill him and abused him physically. The decision of the trier against the defendant on this issue is adequately supported by the evidence, however, and no claim to the contrary has been raised in this appeal.

essential. *North Carolina* v. *Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." Id. Although mere silence after a warning of rights is not enough, "[t]hat does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights." Id. The federal courts have unanimously rejected the claim that refusal to sign a written waiver form precludes a finding of waiver. Id., 375 n.5; *United States* v. *Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974).

The only other circumstances mentioned by the defendant as militating against an effective waiver are his lack of schooling beyond the fourth grade and his illiteracy. Outweighing these considerations, however, are his extensive prior involvement in the criminal justice system, his excellent comprehension of the questions asked of him and insistence upon clarification of them, his reasonably articulate responses, and his artfulness in denying the more reprehensible acts charged against him, as evidenced by the tape recording. The great weight of the evidence shows no indication of overbearing police conduct, physical or psychological, which could reasonably be deemed coercive. We conclude that the trial court's finding of an effective waiver is adequately supported by the evidence.

### III

The defendant claims as error the failure of the court to give a curative instruction to the jury at a point in the trial where the prosecutor asked

a question of a witness which obviously called for a hearsay answer. The victim of the sexual assaults testified that she had heard the defendant whisper a certain telephone number as he attempted to make a call from the phone located in her bedroom. A Bridgeport police officer testified that he had gone to the home of the person listed as the holder of that telephone number and that he spoke to a girl who answered the door and asked whether she or her mother knew the defendant. When the incident occurred at the trial the defendant objected promptly and the prosecutor withdrew the question before it was answered. The court then excused the jury and the defendant moved for a mistrial, the striking of the testimony of the witness, and an instruction to the jury to disregard the question and not to speculate about a possible answer. Upon this appeal the defendant apparently recognizes that the situation did not warrant anything more than a curative instruction. The motion to strike was inappropriate because the witness never answered the question and part of his testimony was relevant to show that the state had investigated this clue. A mistrial should be granted only where the occurrence at trial is of such a nature that a fair trial is seriously and irreparably jeopardized. *State* v. *Hawthorne,* 176 Conn. 367, 372, 407 A.2d 1001 (1978).

We agree with the defendant that it is unprofessional for a prosecutor knowingly to ask a legally objectionable question for the purpose of bringing inadmissible matters to the attention of the jury. ABA Standards Relating to the Administration of Criminal Justice, The Prosecution Function (1974 Ed.) § 5.6 (b); Code of Professional Responsibility, EC No. 7-25. In order to avoid the

unfavorable inference which might otherwise be drawn it is proper for the state to show that reasonable efforts have been made to discover pertinent information. The rules of evidence must, nevertheless, be followed despite the difficulties which may arise. On the other hand, the prosecutor was not obliged to call as his own witness the declarant referred to by the officer since he might then be held to have "vouched" for her credibility. *State* v. *Mitchell,* 169 Conn. 161, 164, 362 A.2d 808 (1975). Although the defendant contends that the jury must inevitably have concluded from his objection that the response of the girl to the police officer would indicate that she knew the defendant, the opposite inference might well have been drawn from the failure of the state to call her as a witness.

In any event, the court did include in the charge to the jury a general instruction to disregard offered evidence which was not admitted because of an objection. Although it may have been preferable to give such an instruction at the time of the occurrence; see *State* v. *Daniels,* 180 Conn. 101, 111–12 n.10, 429 A.2d 813 (1980); the court in its discretion may have decided that to do so would highlight its importance and encourage the very speculation to be avoided. We can find no abuse of discretion in the refusal to give a corrective instruction at the time of the incident rather than in the final charge.

## IV

The defendant requested a charge to the jury that "only a single offense of rape is committed when an individual has several acts of sexual intercourse with the victim in a short period of time." A similar claim that the various sexual acts were merged was

also made in a motion to dismiss several counts of the information at the close of the state's evidence and in a motion for a directed verdict.[7]

The defendant relies upon several Oklahoma cases which contain dicta to the effect that several acts of intercourse with the same victim during a period of time as brief as that involved here may be treated as a single act of rape. *Klinekole* v. *State*, 572 P.2d 994, 998 (Okla. Crim. App. 1977) ; *Turnbow* v. *State*, 454 P.2d 674, 675 (Okla. Crim. App. 1969) ; *Turnbow* v. *State*, 451 P.2d 387, 389 (Okla. Crim. App. 1969). These cases hold merely that where evidence of several acts of intercourse is offered in support of a single charge of rape they may sometimes be regarded as one continuous act for the purpose of a motion requiring the prosecutor to specify upon which act he relies for a conviction. The doctrine would not be applicable to an information making each act relied upon a separate count as in this case. The Oklahoma courts recognize that rape is not a continuous offense. *Cody* v. *State*, 361 P.2d 307, 320 (Okla. Crim. App. 1961). There is ample authority holding that each separate act of forcible sexual intercourse constitutes a separate crime. 1 Wharton, Criminal Law & Procedure (1957) § 304; 65 Am. Jur. 2d, Rape § 106. A different view would allow a person who has committed one sexual assault upon a victim to commit with impunity many other such acts during the same encounter.

The classic test of multiplicity is whether the legislative intent is to punish individual acts sep-

---

[7] This case was tried prior to the adoption of the rules of criminal procedure effective on July 1, 1978, which substituted for the motion to dismiss and the motion for a directed verdict, when used in the course of a trial, the motion for judgment of acquittal. Practice Book, 1978, § 883.

arately or to punish only the course of action which they constitute. *Blockburger* v. *United States,* 284 U.S. 299, 302, 52 S. Ct. 180, 76 L. Ed. 2d 306 (1932); *State* v. *Cimino,* 33 Conn. Sup. 680, 684–85, 366 A.2d 1168 (1976). In this case each assault upon the victim involved a separate act of will on the part of the defendant and a separate indignity upon the victim. Under these circumstances we believe the legislative intention was that each assault should be deemed an additional offense.

## V

In a supplemental brief the defendant makes a final claim of error that his constitutional right to a public trial was violated when the court, suo motu, ordered that the courtroom be cleared of spectators during the testimony of the victim of the sexual assaults. The defendant did make a timely objection which the court overruled. The record indicates that only three male spectators unconnected with the case[8] were excluded from the courtroom as a result of the order.

It is unquestionable that the right to a public trial is guaranteed by our federal[9] and state[10] constitutions in all criminal prosecutions. We recognize, however, that "[a]n accommodation must sometimes be made between the individual's right to a public trial and other societal interests that

---

[8] The court at the start of the trial had ordered that all potential witnesses be sequestered at the request of both the defendant and the state. See General Statutes § 54-85a.

[9] Article VI of the amendments to the constitution of the United States provides, in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."

[10] Article first, section 8 of the constitution of Connecticut provides, in part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial . . . ."

might justify closing the courtroom to the public." *State* v. *Sheppard,* 182 Conn. 412, 416, 438 A.2d 125 (1980). We have indicated that closure of a courtroom should be limited to those situations where such action is "demonstrably necessary to further the administration of justice." Id. To the same purport is Practice Book § 895 which authorizes closure "when there is a substantial likelihood that the presence of the public . . . would unduly inhibit any testimony . . . ."

Temporary exclusion of the general public from the courtroom has been a frequent practice during the testimony of the victim of a particularly revolting rape. *State* v. *Purvis,* 157 Conn. 198, 207, 251 A.2d 178 (1968), cert. denied, 395 U.S. 928, 89 S. Ct. 1788, 23 L. Ed. 2d 246 (1969); *State* v. *Gionfriddo,* 154 Conn. 90, 93, 221 A.2d 851 (1966). "[A] demonstrated need to protect a witness from a substantial threat of indignity that might induce reluctance to testify about a lurid or heinous sexual assault" has been cited as a classic situation where closure would be appropriate. *State* v. *Sheppard,* supra; *United States ex rel Latimore* v. *Sielaff,* 561 F.2d 691, 694 (7th Cir. 1977), cert. denied, 434 U.S. 1076, 98 S. Ct. 1266, 55 L. Ed. 2d 782 (1978); *Harris* v. *Stephens,* 361 F.2d 888, 891 (8th Cir. 1966), cert. denied, 386 U.S. 964, 87 S. Ct. 1040, 18 L. Ed. 2d 113 (1967).

The defendant does not quarrel with these principles but with their application in this case. He claims that the record fails to show any reasonable basis for the closure order at the time it was entered. It is essential that some information be furnished to the court "to demonstrate a compelling need" to deny the right of public trial. *State* v. *Sheppard,* supra, 417. At the time of entering the

closure order, the court had before it the information which included four counts of rape in the first degree by engaging in sexual intercourse with the victim by forcible compulsion and three counts of deviate sexual intercourse in the first degree by forcible compulsion. The definition of "deviate sexual intercourse" contained in General Statutes § 53a-65[11] was some indication that the testimony of the victim was likely to be "lurid" and "revolting." In addition we may presume that the court took judicial notice of the file; *Brockett* v. *Jensen,* 154 Conn. 328, 336, 225 A.2d 190 (1966); which contained an affidavit of the investigating police officer attached to the bench warrant application which gave the victim's detailed account of the evidence supporting the charges and the heinous circumstances under which they were committed. *Brockett* v. *Jensen,* supra. Prior to the victim's appearance on the stand and any observations of her demeanor which may have influenced the court, her husband testified that as he lay bound on the kitchen floor he heard his wife crying and gasping in the bedroom upstairs while the defendant was assaulting her. He also said that he found her to be "very, very upset" when he went upstairs after he had freed himself and his two children soon after the defendant had departed. Another indication of the sensitivity of the victim which had come to the attention of the court was a comment of the defendant contained in the tape recording of his interview at the police station. When he was told of the likeli-

---

[11] General Statutes 1975 § 53a-65 (2) (repealed by Public Acts 1975, No. 75-619, §1) defines "deviate sexual intercourse" to mean "(a) sexual contact between persons not married to each other consisting of contact between the penis and the anus, the mouth and the penis, or the mouth and the vulva, or (b) any form of sexual contact with an animal or dead body."

hood of a rape charge, after he had confessed to the burglary and larceny crimes, he mentioned that the woman might be "neurotic" or "crazy" and that he thought she was an alien. Referring again to the rape charge he continued: "It's gonna cause her just as much misery and grief as it's gonna cause me, I mean, appearing in court, you know . . . ." It appears that it was the defendant himself who, when told by his counsel that the courtroom was being cleared because the victim's testimony would probably be of a sexual nature, insisted that the courtroom remain open. Although the transcript does not reveal the hesitation or distress which the victim endured during her testimony describing the various indignities to which she was subjected, defense counsel on two occasions was moved to comment that it was a "difficult situation" for her.

Although the showing of the factual basis which led the court to order closure lacks some of the formality we would prefer, we think the record sufficiently supports the action of the trial court. There is far more here than a simple charge of rape, where the principal issue was whether the victim had consented, which we found insufficient to support exclusion of the public in *State* v. *Sheppard,* supra. The basis for this order of the trial court compares favorably with that in many other cases in which closure has been approved under similar circumstances. *United States ex rel. Latimore* v. *Sielaff,* 561 F.2d 691, 694 (7th Cir. 1977), cert. denied, 434 U.S. 1076, 98 S. Ct. 1266, 55 L. Ed. 2d 782 (1978); *Harris* v. *Stephens,* 361 F.2d 888, 891 (8th Cir. 1966), cert. denied, 386 U.S. 964, 87 S. Ct. 1040, 18 L. Ed. 2d 113 (1967); *State* v. *Purvis,* 157 Conn. 198, 207, 251 A.2d 178 (1968), cert. denied, 395 U.S. 928, 89 S. Ct. 1788, 23 L. Ed. 2d 246 (1969);

*State* v. *Smith,* 123 Ariz. 243, 249–50, 599 P.2d 199 (1979); *Bivins* v. *State,* 313 So. 2d 471, 472 (Fla. App. 1975); *People* v. *Latimore,* 33 Ill. App. 3d 812, 818–19, 342 N.E.2d 209 (1975); *State* v. *Padilla,* 91 N.M. 800, 802–803, 581 P.2d 1295 (1978); *Commonwealth* v. *Stevens,* 237 Pa. Super. 457, 466–68, 352 A.2d 509 (1975); *State* v. *Santos,* 122 R.I. 799, 413 A.2d 58 (1980); *Price* v. *State,* 496 S.W.2d 103, 108 (Tex. Crim. App. 1973).

There is no error.

In this opinion the other judges concurred.