STATE OF CONNECTICUT *v.* WILLIAM TOSTE
(10971)

PETERS, C. J., SHEA, SANTANIELLO, BRENNEMAN and M. HENNESSEY, Js.

Argued November 6, 1985—decision released February 11, 1986

*Joseph G. Bruckmann,* assistant public defender, with whom, on the brief, were *Joette Katz,* public defender, and *Margaret Hayman,* former assistant public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Domenick J. Galluzzo,* for the appellee (state).

SANTANIELLO, J. The defendant, William Toste, was arrested on December 20, 1974, for the killing of Mavis Hardy of Bridgeport. He was subsequently indicted for murder in violation of General Statutes § 53a-54a, tried before a jury, and found guilty. He was sentenced on November 12, 1976, and an appeal to this court followed. On August 14, 1979, we granted him a new trial because of an erroneous charge to the jury on the insanity defense. *State* v. *Toste,* 178 Conn. 626, 424 A.2d 293 (1979). The retrial commenced on March 18, 1981. The defendant was again found guilty and was given a sentence of twenty-five years to life. He now appeals that conviction.

The jury could reasonably have found the following facts. On the morning of December 20, 1974, the defendant bought and drank some beer and went to the home of Mavis Hardy on Upton Street in Bridgeport. Hardy lived there with her son, Phillip Monteith, who was a friend of the defendant. Hardy had previously refused the defendant's request to move in and live with her son "like a brother." No one was home at the time he approached the house, so he gained entrance by breaking a window. He searched the house for money and took some coins and two watches. When he heard a car in the driveway, he went into the basement. Through a window, he saw that Hardy had come home. The defendant then took a pair of tinsnips, put on a pair of gloves and put a towel over his face. When Hardy went into the kitchen, he went upstairs and hit her twice in the head with the tinsnips. He then grabbed a knife and stabbed her in the back approximately twenty times. He also took a longer knife, a fork and a nail file and stabbed her again repeatedly.

The defendant fled the house, taking the victim's car. He was arrested later that day after becoming involved in two accidents with the stolen car. His clothes were spattered with the victim's blood and in his pockets were found the coins and watches taken from the Hardy residence. That evening, the defendant orally confessed to Captain Anthony Fabrizi of the Bridgeport police and apologized to Monteith for what he had done to his mother. Three days later he signed a written confession stating that he had planned to kill Hardy because he wanted to move into her house and live with her son and she would not allow it.

The defendant appeals claiming (1) that the trial court erred in failing to suppress the inculpatory statements given to the police,[1] and (2) that the nineteen month delay before his retrial denied him his right to a speedy trial. We find no error.

I

The defendant claims that the oral statements made the night of his arrest[2] and the written statements

---

[1] The state argues that the issue concerning the confessions was already decided by this court in the prior appeal; *State* v. *Toste,* 178 Conn. 626, 424 A.2d 293 (1979); and therefore need not be addressed. It is true that the constitutionality of the admission of the confessions was raised and briefed in the prior appeal. The state argued both that the defendant waived his right to raise the claim on appeal by failing to object to the confessions at trial, and that the state had met its burden on the issues of voluntariness and waiver of constitutional rights. We held that there was no error in the admission of the confessions, but the opinion of the court did not disclose on what grounds we so held. Because of the possibility that the issue was decided on the failure to object at the first trial, we will entertain the claim again on this appeal.

[2] The defendant has claimed that, as to the Friday statements, both his confession to Fabrizi and his statements to Monteith should have been suppressed. He argues essentially that the statements to Monteith were made only because he had already let "the cat out of the bag." See *United States* v. *Bayer,* 331 U.S. 532, 540, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947); *State* v. *Rosa,* 170 Conn. 417, 425-28, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976). Because we hold that the Friday

made three days later were erroneously admitted. He argues that the state failed to meet its burden of establishing that he waived his constitutional privilege against self-incrimination, as required by *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966),[3] and that the state failed to show that the statements were made voluntarily. During trial, the court ruled the statements admissible after extensive testimony on the circumstances surrounding the confessions was elicited from Fabrizi on voir dire examination. On appeal, in order to determine whether the defendant's constitutional rights have been infringed, we review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling admitting the statements was made. *Beckwith* v. *United States,* 425 U.S. 341, 348, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976); *Davis* v. *North Carolina,* 384 U.S. 737, 741–42, 86 S. Ct. 1761, 16 L. Ed. 2d 895 (1966);

statements to Fabrizi were properly admitted, we need not address this additional claim. The defendant concedes that the apology to Monteith was spontaneously volunteered and makes no claim as to the admissibility of the apology apart from his argument under the doctrine of *United States* v. *Bayer,* supra.

The defendant has also called into question the admissibility of the Monday confession, given the claimed illegality of the Friday confession, and he again invokes the same "cat out of the bag" doctrine under *United States* v. *Bayer,* supra. Again, because we hold that the Friday statements were admissible, we do not reach this additional claim.

[3] The defendant has made his claim under both the federal and state constitutions. We have held: "Although the *Miranda* warnings were originally effective in state prosecutions only because they were a component of due process of law under the fourteenth amendment; *Miranda* v. *Arizona,* [384 U.S. 436, 463–65, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]; *Malloy* v. *Hogan,* 378 U.S. 1, 3, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); they have also come to have independent significance under our state constitution. Conn. Const., art. I, § 8; *State* v. *Falby,* 187 Conn. 6, 11 and n.1, 444 A.2d 213 (1982)." *State* v. *Ferrell,* 191 Conn. 37, 40–41, 463 A.2d 573 (1983). The defendant, however, "has proffered no argument that the rights afforded to him by the federal and the state constitutions are in any way distinguishable with respect to the substantive issue that he has raised. We see no reason, on the facts of this case, independently to undertake such an analysis." *State* v. *Braxton,* 196 Conn. 685, 688 n.2, 495 A.2d 273 (1985).

*Lodowski* v. *State,* 302 Md. 691, 711, 490 A.2d 1228 (1985); see also *Carroll* v. *United States,* 267 U.S. 132, 162, 45 S. Ct. 280, 69 L. Ed. 543 (1925); *State* v. *Randall,* 94 Ariz. 417, 419, 385 P.2d 709 (1963).

The circumstances leading to the incriminating statements can be summarized as follows: The defendant was brought to the police station immediately after his arrest on Friday, December 20, 1974, and was read his *Miranda* rights by Fabrizi.[4] The defendant, after each warning was read, orally indicated that he understood it. He also signed a written form acknowledging that he understood his rights. The defendant was then given a pat down search which turned up coins and watches from the Hardy home. Fabrizi asked him if he wanted to tell him what had happened at the victim's home and reminded him about the blood on his clothes and the items found in his pockets. The defendant first told Fabrizi that he and another man had gone to the Hardy home but that it was his companion who had killed Hardy. Thereafter, however, the defendant recanted and admitted that he had no accomplice and that it was

---

[4] The *Miranda* warnings were read from the police department's "notification of rights" form. The form, which the defendant signed, also served as an acknowledgment that the defendant received and understood his rights. The form used here provided:

"The Constitution requires that I inform you of your rights;

"You have a right to remain silent. If you talk to any police officer, anything you say can and will be used against you in court.

"You have a right to consult with a lawyer before you are questioned, and may have him with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning. If you wish to answer questions, you have the right to stop answering at any time.

"You may stop answering questions at any time if you wish to talk to a lawyer, and may have him with you during any questioning.

"I fully understand the above notification of rights.

     "Signed _____

     "Time: _____

     "Date: _____

"Witness: _____ "

he who had committed the killing. Fabrizi then told the defendant that they needed his clothes and asked him to remove them. The defendant's reaction to the request was to yell an obscenity and get up from his chair with his hand in a fist. The captain came around the table, slapped the defendant and pushed him back into his chair. After another request for the clothes, the defendant complied.

At this time, the defendant asked if he could see Monteith. When Monteith was brought in, the defendant apologized for what he had done to his mother and explained that he only wanted to live with him. The defendant also indicated to Fabrizi that he needed help and that he did not want to go to jail. Fabrizi told him that he did not have the authority to send him to a mental health facility, but did say that he would ask the court to order a mental evaluation. The defendant was then taken to a cellblock and had no contact with Fabrizi until Monday, December 23.

At about 9 a.m. on Monday, Fabrizi brought the defendant out of his cell and read him his *Miranda* rights in the same fashion as on Friday—stopping after each paragraph and asking him if he understood. The defendant responded affirmatively and again signed an acknowledgment form. Fabrizi then asked the defendant if he wanted to give a written statement concerning the murder, and the defendant agreed. The captain posed questions and typed the defendant's answers. In his statements the defendant described in detail how he had killed the victim.

Fabrizi testified that he had known the defendant for four or five years. When asked about the defendant's mental capacity, Fabrizi stated that "he operates at about a sixth to seventh grade level, [is] street wise, communicates well, [has] no extensive vocabulary, but he understands, he comprehends. . . . He reads very

haltingly. His ability to write is not good at all . . . he prints most everything." Fabrizi said that on Friday the defendant was nervous and had been drinking, but that he had responded to questions in "good, clear speech" and that his demeanor indicated that "he was all right." Psychological testing admitted during trial on the issue of insanity indicated that the defendant had an IQ in the 68–71 range, was mildly retarded and was of "dull normal" intelligence. A psychiatrist and a clinical psychologist who testified on behalf of the state concluded that he had no thought disorders or any major psychiatric disturbances which would interfere with his ability to understand the nature of the charges against him or to assist his counsel in the preparation of a defense. A clinical psychologist called by the defense testified that the defendant had a profile of a very violent person and had been diagnosed as a "frantic schizophrenic."

## A

The defendant claims that the state failed to prove that he had knowingly and intelligently waived his right to remain silent at the time he made incriminating statements. Specifically, he argues that he had a limited ability to understand the *Miranda* warnings as read to him and that the police did not adequately explain the meaning of his rights. As to the Friday statements, he claims that intoxication additionally may have interfered with his ability to understand. He also argues that the state did not show that he had waived his rights by his course of conduct.

"In order to show that the defendant waived his privilege against self-incrimination, the state must prove by a preponderance of the evidence that he knowingly and intelligently waived his constitutional right to remain silent. *State* v. *Alfonso*, 195 Conn. 624, 628, 490 A.2d 75 (1985); *State* v. *Perry*, 195 Conn. 505, 516 n.8,

488 A.2d 1256 (1985)." *State* v. *Aversa,* 197 Conn. 685, 695, 501 A.2d 370 (1985); see *Miranda* v. *Arizona,* supra. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Frazier,* 185 Conn. 211, 226, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' *Johnson* v. *Zerbst,* 304 U.S. 458, 464 [58 S. Ct. 1019, 82 L. Ed. 1461 (1938)]." *North Carolina* v. *Butler,* supra, 374–75. The issue of waiver is factual, "but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. *Culombe* v. *Connecticut,* 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961)." *State* v. *Frazier,* supra, 219.

Whether the defendant has "knowingly and intelligently waived" his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. See *Tague* v. *Louisiana,* 444 U.S. 469, 469–70, 100 S. Ct. 652, 62 L. Ed. 2d 622 (1980); *Fare* v. *Michael C.,* 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197, reh. denied, 444 U.S. 887, 100 S. Ct. 186, 62 L. Ed. 2d 121 (1979); see generally 1 LaFave & Israel, Criminal Procedure (1984) § 6.9 (b). Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings; *Fare* v. *Michael C.,* supra, 726; *State* v. *Alfonso,* supra,

630–31; *People* v. *Medina,* 71 Ill. 2d 254, 259, 375 N.E.2d 78 (1978); his level of intelligence, including his IQ; *Cooper* v. *Griffin,* 455 F.2d 1142, 1145 (5th Cir. 1972); *State* v. *Benoit,* 440 So. 2d 129, 131 (La. 1983); *Matter of Welfare of S.W.T.,* 277 N.W.2d 507, 512–13 (Minn. 1979); his age; *Fare* v. *Michael C.,* supra; *Matter of D.A.S.,* 391 A.2d 255, 258 (D.C. App. 1978); his level of education; *Davis* v. *North Carolina,* 384 U.S. 737, 742, 86 S. Ct. 1761, 16 L. Ed. 2d 895 (1966); *State* v. *Harris,* 188 Conn. 574, 581, 452 A.2d 634, cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1982); his vocabulary and ability to read and write in the language in which the warnings were given; see *State* v. *Alfonso,* supra; *State* v. *Frazier,* supra, 226; intoxication; see *State* v. *Stankowski,* 184 Conn. 121, 134–35, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); his emotional state; *State* v. *Harris,* supra, 582; and the existence of any mental disease, disorder or retardation. *Henry* v. *Dees,* 658 F.2d 406, 411 (5th Cir. 1981); *People* v. *Watson,* 75 Cal. App. 3d 384, 397, 142 Cal. Rptr. 134 (1977).

Reviewing the record in this case in light of the above factors, we find that the state has met its burden of showing that the defendant had the capacity to understand the meaning of his rights as explained to him by the police. The defendant was an adult, was familiar with police procedures and had been arrested previously. He was described as being street-wise and as operating on a sixth or seventh grade level. He could communicate well orally, could read and write to some degree, and had good comprehension. Although the defendant did have a fairly low IQ and there was some evidence that he was schizophrenic, these facts alone do not compel a finding that he could not understand the meaning of his rights. See *People* v. *Watson,* supra, 396 (where confession from an accused with an IQ of 65 and with signs of chronic organic brain damage and

schizophrenia was admitted); *State* v. *Moss,* 7 Kan. App. 2d 215, 216–17, 640 P.2d 321 (1982) (63 IQ; eighth grade education); *Commonwealth* v. *White,* 362 Mass. 193, 196, 285 N.E.2d 110 (1972) (low IQ; illiterate); *State* v. *Adkins,* 289 S.E.2d 720, 728 (W. Va. 1982) (49 IQ; moderate retardation). Two psychologists and one psychiatrist testified at trial and gave no testimony which would cast doubt on the defendant's ability to understand the meaning of the *Miranda* warnings. Also, Fabrizi, relying on his familiarity with the defendant and his past conversations with him, testified that the defendant knew the meaning of his rights. The defendant, when asked if he understood his rights, responded affirmatively and signed acknowledgment forms so indicating. Although the defendant had been drinking earlier on Friday, there was no evidence that the defendant was intoxicated at the time he made the incriminating statements; in fact, Fabrizi testified that the defendant had conversed in "good, clear speech." There was also no evidence that the defendant's emotional state impaired his ability to understand his rights.

Although we conclude that there was substantial evidence to support the finding that the defendant had the capacity to understand his rights as read to him and that he understood them, this does not end our inquiry. "Waiver is not conclusively established by demonstrating that *Miranda* warnings were given and understood. *State* v. *Wilson,* [183 Conn. 280, 284, 439 A.2d 330 (1981)]; see *United States ex rel. Abubake* v. *Redman,* 521 F. Sup. 963, 975 (D. Del. 1981). . . ." *State* v. *Aversa,* supra, 695, quoting *State* v. *Harris,* supra, 579–80. "In the absence of an express waiver, the state bears the heavy burden of demonstrating, as a matter of fact, that 'waiver can be clearly inferred from the actions and words of the person interrogated.' *North Carolina* v. *Butler,* supra, 373." *State* v. *Harris,* supra, 580.

A review of the record in this case reveals that there was substantial evidence that the defendant through his actions and words waived his right to remain silent. As to the Friday confession, Fabrizi first apprised the defendant of his rights, then asked if he wanted to tell him what had happened at the Hardy home. The defendant did not refuse to speak; instead, he gave a detailed description of what he did that day, openly telling the officer that he had been in the victim's home but that he had not killed her. Then, immediately thereafter, he admitted that he had committed the murder. The lack of hesitancy to speak at that time, his loquacity, and the fact that his answers were in narrative form rather than just monosyllabic "yes" and "no" all indicate that he desired to speak and to waive his right to remain silent. See *State* v. *Aversa,* supra, 696–97. As to the Monday confession, Fabrizi went over the defendant's rights paragraph by paragraph, and then asked the defendant if he would like to make a written statement telling the truth about what had happened. The defendant expressly agreed. He then proceeded to answer questions put to him by Fabrizi and signed the written version of those statements. "Under these circumstances, the defendant's expressed willingness to speak constituted an explicit affirmative act evidencing waiver . . . . " *State* v. *Harris,* supra, 580.

## B

The defendant makes the related claim that the statements made to the police were not voluntarily given. He argues that his limited intelligence and mental instability diminished his capacity to make a voluntary confession. He also claims that Fabrizi coerced him into confessing on Monday by his use of physical force and promises of pyschiatric treatment on Friday.

" 'It is the state's burden to prove by a preponderance of the evidence that the challenged confession was

made voluntarily. *Lego* v. *Twomey,* 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Hawthorne,* 176 Conn. 367, 370, 407 A.2d 1001 (1978). The test of voluntariness is whether an examination of all the circumstances shows that the conduct of police was such as to overbear the defendant's will to resist and bring about a confession not freely self-determined.' " *State* v. *Perry,* 195 Conn. 505, 515–16, 488 A.2d 1256 (1985), quoting *State* v. *DeForge,* 194 Conn. 392, 397–98, 480 A.2d 547 (1984). The factors taken into account when assessing the totality of the circumstances include many of those used when determining the capacity of the defendant to waive his *Miranda* rights knowingly and intelligently. Some of the considerations include the youth of the accused, his lack of education or low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the interrogation, and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

After a careful review of the record, we agree with the trial court's conclusion that under all of the circumstances the two confessions here were voluntary. Reviewing the evidence concerning the defendant's mental capacity, we are satisfied that he was fully capable of voluntarily giving a confession. The defendant was advised of his rights before each confession and he was not interrogated for long periods of time nor repeatedly badgered by the police. Cf. *Culombe* v. *Connecticut,* 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). Although the defendant was "slapped" and "shoved" by Fabrizi on Friday after his first incriminating statements were made, there is absolutely no evidence to support the claim that this incident in any way affected the voluntariness of either confession. If anything, the evidence showed that the use of force by

Fabrizi was necessary to restrain the defendant and had not been used to intimidate him.[5] While we recognize that in some cases promises by the police will invalidate a subsequent confession; see *Lynumn* v. *Illinois,* 372 U.S. 528, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963); there is no evidence in this case that the promise of a psychiatric examination was the procuring cause of either confession. See *State* v. *Falby,* 187 Conn. 6, 18, 444 A.2d 213 (1982).

## II

The defendant's remaining claim is that he was denied his right to a speedy trial. Specifically, he argues that the delay in retrying him violated General Statutes §§ 54-82c and 54-82d, and also violated his right to a speedy trial under the sixth amendment to the federal constitution and article first, § 8, of the Connecticut constitution. We do not agree.

## A

General Statutes §§ 54-82c and 54-82d[6] provide a statutory method by which an inmate of a Connecti-

---

[5] While the defendant had no obligation to testify on this matter and the burden is on the state to show voluntariness of the confessions, a court cannot supply evidence that is lacking. *State* v. *Aversa,* 197 Conn. 685, 697, 501 A.2d 370 (1985); *State* v. *Harris,* 188 Conn. 574, 579–80, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

[6] General Statutes § 54-82c, formerly General Statutes § 54-139, provides: "(a) Whenever a person has entered upon a term of imprisonment in a correctional institution of this state and, during the continuance of the term of imprisonment, there is pending in this state any untried indictment or information against such prisoner, he shall be brought to trial within one hundred twenty days after he has caused to be delivered, to the state's attorney or assistant state's attorney of the judicial district or geographical area, in which the indictment or information is pending, and to the appropriate court, written notice of the place of his imprisonment and his request for final disposition to be made of the indictment or information. For good cause shown in open court, the prisoner or his counsel being present, the court may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the warden, community correctional center administrator or other official having custody of the

cut penal institution who has a detainer placed against him can request and receive an expedited disposition of pending charges. The inmate must be serving a sentence at that time in order to have the procedure available to him. General Statutes § 54-82c (a). Pretrial detainees are not eligible. See *United States* v. *Reed,* 620 F.2d 709, 711 (9th Cir. 1980); *United States* v. *Milhollan,* 599 F.2d 518, 528 (3d Cir.), cert. denied, 444 U.S. 909, 100 S. Ct. 221, 62 L. Ed. 2d 144 (1979). Eligible inmates are entitled to a trial within 120 days or to a dismissal of the pending charges, if they follow the procedure outlined in the statutes. First, the inmate must request an expedited hearing under the statutes by giving written notice to the "warden, community correctional center administrator or other official having custody of him . . . ." General Statutes § 54-82c (b). The prison official must then forward the request by certified mail to the "appropriate prosecut-

---

prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner and any decisions of the parole board relating to the prisoner.

"(b) The written notice and request for final disposition referred to in subsection (a) hereof shall be given or sent by the prisoner to the warden, community correctional center administrator or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

"(c) The warden, community correctional center administrator or other official having custody of the prisoner shall promptly inform him in writing of the source and contents of any untried indictment or information against him concerning which the warden, administrator or other official has knowledge and of his right to make a request for final disposition thereof.

"(d) Escape from custody by the prisoner subsequent to his execution of the request for final disposition referred to in subsection (a) hereof shall void the request."

General Statutes § 54-82d, formerly General Statutes § 54-140, provides: "If an action is not assigned for trial within the period of time as provided in section 54-82c, no court of this state shall any longer have jurisdiction thereof, nor shall the untried indictment or information be of any further force or effect, and the court shall enter an order dismissing the same."

ing official and court," together with a certificate "stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner and any decisions of the parole board relating to the prisoner." General Statutes § 54-82c (a). If the procedure is complied with and the case is not assigned for trial within 120 days, then the charges must be dismissed. General Statutes § 54-82d. The trial court may, however, toll the 120-day period by granting, for good cause shown, "any necessary or reasonable continuance." General Statutes § 54-82c (a).

This court overturned the defendant's original conviction of murder and ordered a new trial in a decision dated August 14, 1979. The defendant at that time was serving a sentence for manslaughter, a crime wholly unrelated to the one in the case before us. The sentence imposed for the manslaughter conviction was discharged on March 31, 1980. After the sentence had expired, the defendant remained incarcerated in lieu of bond while awaiting retrial on the murder charges. The new trial did not commence until March 18, 1981.

The defendant, in a letter dated October 24, 1979, sent a request to Kay Bryan, the records supervisor of the Connecticut correctional institution at Somers, asking her to file a "Speedy Trial Disposition" on his behalf. Attached to the request was a copy of a letter which he had sent the same day addressed to the "Court House" in Bridgeport. In this letter he also requested a "Speedy Trial Disposition." Bryan forwarded copies of the request to the state's attorney's office with a letter stating that she was unaware of any "outstanding warrants on which to process a speedy trial." On May 5, 1980, the defendant filed a pro se motion to dismiss. The defendant in the motion sought to have the charges against him dismissed because the state had failed to

grant him a trial within the time limit prescribed by General Statutes §§ 54-139 and 54-140 (now §§ 54-82c and 54-82d). A hearing was held on the motion on December 1, 1980, in which the state argued that the statutory provisions invoked by the defendant had not been complied with and that the defendant's constitutional rights were not violated by the delay. The trial court denied the motion without comment on January 6, 1981.

The defendant in this case clearly had not complied with the statutory requirements of General Statutes §§ 54-82c and 54-82d when making his request for a "speedy trial." First, the defendant did not bring to Bryan's attention the fact that he was relying on this particular statutory procedure. Bryan could have considered the defendant's letter as a request for a speedy trial as a matter of constitutional right. Second, the request as forwarded to the state's attorney and the Superior Court in Bridgeport never mentioned the statutory procedure now relied upon by the defendant. As such, the state's attorney and the court were never put on notice that the defendant was invoking his rights under the statutes. Third, Bryan never obtained and forwarded a certificate stating the nature of the sentence then being served. Thus, neither the court nor the state's attorney was informed as to whether the defendant was even eligible under the statutes.

On the few occasions that we have had the opportunity to apply General Statutes §§ 54-82c and 54-82d, we have required strict compliance with the statutory notice procedures. For instance, in State v. Springer, 149 Conn. 244, 178 A.2d 525 (1962), we held that an initial request to the prison official was not sufficient to start the running of the 120 day period. The defendant must show that there was actual delivery of the request and supplemental information to the appropriate prosecuting authority and court before invoking his

right to a speedy trial under the statute. Id., 250. In *State* v. *Best*, 171 Conn. 487, 492, 370 A.2d 1035 (1976), we reaffirmed the rule of *State* v. *Springer*, supra, and held that "notice to both prosecutor and court was necessary to commence the running of the 120-day period." And, recently in *State* v. *McCarthy*, 197 Conn. 166, 496 A.2d 190 (1985), we rejected the argument that the statute begins to run when the inmate files a request with the prison official where the official, for reasons unexplained, did not promptly forward the request to the appropriate prosecuting authority and court. In *McCarthy* we made it incumbent upon the defendant to show that the prison official was in derogation of his duty and we refused to presume that the official had acted improperly under the statute. Id., 171.

In this case, because the defendant did not comply with the notice provisions of General Statutes §§ 54-82c and 54-82d, he was not entitled to a dismissal of the charges against him and he was not denied his right to a speedy trial under these statutes.[7]

## B

"The sixth amendment guarantee of a speedy trial is a fundamental right applicable to the states through the fourteenth amendment to the United States constitution. *Klopfer* v. *North Carolina*, 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). This right is also guaranteed by the Connecticut constitution, article

[7] Other courts applying the Interstate Agreement on Detainers, a statute very similar to General Statutes §§ 54-82c and 54-82d, codified in § 54-186, have adopted the same rule requiring strict compliance with the notice procedures. See, e.g., *Seymore* v. *State*, 429 So. 2d 1188, 1193–94 (Ala. Crim. App. 1983); *State* v. *Bass*, 320 N.W.2d 824, 828–29 (Iowa 1982); *Hines* v. *State*, 58 Md. App. 637, 649–50, 473 A.2d 1335 (1984); *Hill* v. *Jones*, 94 App. Div. 2d 904, 463 N.Y.S.2d 655 (1983); *State* v. *Smith*, 64 Or. App. 588, 669 P.2d 368, 369–70 (1983); *Commonwealth* v. *Gonce*, 320 Pa. Super. 19, 28, 466 A.2d 1039 (1983).

first, § 8. . . . The Supreme Court of the United States and this court have identified four factors which form the matrix of the defendant's constitutional right to speedy adjudication: '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' *Barker* v. *Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *State* v. *Lloyd*, 185 Conn. 199, 208, 440 A.2d 867 (1981); *State* v. *Nims*, 180 Conn. 589, 591, 430 A.2d 1306 (1980). A balancing test is to be applied on a case by case basis. None of the factors standing alone demands a set disposition; rather it is the total mix which determines whether the defendant's right was violated. *State* v. *Nims*, supra, 591–92." *State* v. *Johnson*, 190 Conn. 541, 544–45, 461 A.2d 981 (1983); *State* v. *Gaston*, 198 Conn. 435, 437, 503 A.2d 594 (1986).

There was a nineteen month delay in this case between the date of our decision in *State* v. *Toste*, 178 Conn. 626, 424 A.2d 293 (1979), and the time of retrial. In part, this delay resulted from the fact that during the period the defendant had a total of three different public defenders appointed to represent him. The attorney originally appointed, Edward Kunin, filed a motion to withdraw on November 15, 1979, because the defendant had threatened his life. The next attorney appointed, Victor Ferrante, was allowed to withdraw on July 9, 1980, after the defendant refused to cooperate with the court until new counsel was appointed. On July 21, 1980, attorney Joseph Brophy was appointed and remained the defendant's public defender through the time of trial.

There was also substantial delay caused by psychiatric examinations conducted pursuant to Practice Book § 760[8] and by a sanity hearing requested by the

[8] Practice Book § 760 provides: "In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant

defendant's counsel. The state had first requested a psychiatric examination on March 6, 1980, but the doctor appointed to conduct the evaluation had to be replaced. This change was accomplished by a second motion for a psychiatric examination filed on April 23, 1980. The defendant refused to cooperate with the court-appointed doctors and, as a result, the state filed a motion to strike the defendant's defense of mental disease or defect on June 29, 1980. At a hearing on the motion on July 9, 1980, defense counsel requested a sanity hearing to determine whether the defendant was competent to stand trial. One of the doctors appointed to conduct the psychiatric examination was appointed by the court to conduct a sanity examination. On November 18, 1980, that doctor concluded his evaluations and filed his written report pursuant to General Statutes § 54-56d (formerly General Statutes § 54-40). Finally, on December 1, 1980, a hearing was held at which the court determined that the defendant was competent to stand trial.

The delay in this case did not presumptively violate the defendant's constitutional rights, but it was of sufficient length to trigger analysis of the other three factors set out in *Barker* v. *Wingo,* supra. See *State* v. *Johnson,* supra, 545. Reviewing the reasons for the delay, we note that the state must bear some of the responsibility for the nineteen month lapse, particularly for the period of time between March 6, 1980, and May 19, 1980. The record indicates, however, that the defendant himself contributed substantially to the

to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination provided for by Sec. 757, whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. A copy of the report of the psychiatric examination shall be furnished to the defendant within a reasonable time after the examination."

delay. Of particular note are his changes in counsel and disruptive court behavior. The defendant did assert his right to a speedy trial through his motion to dismiss dated May 5, 1980, but we note that on two separate occasions the defendant declined the opportunity to argue his motion before the court. On the issue of prejudice, the "linchpin" of a claim involving the right to a speedy trial; *State* v. *Lloyd,* supra, 209; the defendant has claimed that he was prejudiced by his extended incarceration and by the effect of time on Fabrizi's memory. The defendant, however, has made no showing that extended imprisonment caused him unusual anxiety or that the decline in Fabrizi's memory, if any, affected the trial.

Overall, analyzing the facts of this case in light of the factors set out in *Barker* v. *Wingo,* supra, and *State* v. *Johnson,* supra, we conclude that the defendant's constitutional right to a speedy trial was not violated.

There is no error.

In this opinion the other judges concurred.