STATE OF CONNECTICUT *v.* BERNARD WHITAKER
(13728)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL Js.

Argued May 9—decision released July 24, 1990

*Robert M. Casale,* with whom was *Frank A. Iannotti,* for the appellant (defendant).

*Timothy J. Sugrue,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *David P. Gold,* assistant state's attorney, for the appellee (state).

SHEA, J. The defendant, Bernard Tyrone Whitaker, was charged with the crime of murder in violation of General Statutes §§ 53a-54a (a)[1] and 53a-8.[2] The defend-

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believe them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission

ant was seventeen years old at the time of his arrest. Prior to the trial, the defendant filed a motion to suppress inculpatory oral statements he had allegedly made to a police officer during a custodial interrogation at the police station. After a hearing, the court denied the motion, and the police officer testified at the trial concerning the defendant's statements. The defendant testified at the hearing, but not at his trial. After a jury trial, he was convicted and sentenced to a term of fifty years imprisonment. On appeal from the judgment, the defendant challenges the trial court's admission into evidence of testimony concerning his inculpatory statements, arguing that he had not knowingly and voluntarily waived his rights to remain silent and to consult with counsel prior to making the statements. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. The defendant was involved in drug dealing in the Pine Street area of New Haven. After a group of Jamaicans from the Liberty Street area of New Haven threatened to take over the Pine Street area narcotics trade, the defendant and two companions went to the Liberty Street area to shoot some of the Jamaicans and intimidate others into abandoning the takeover. When they arrived, they saw a man whom one of the defendant's companions identified as being Jamaican, not from personal knowledge, but from the man's appearance. The defendant and his companions opened fire on the unknown Jamaican and killed him. They fled on foot, but were confronted by two uniformed police officers who were in the area investigating an unrelated complaint. The officers pursued the assailants but caught only the defendant. Police later retrieved the

of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

defendant's gun from under a car where he had thrown it during the chase, and found bullets and casings from the gun near the victim's body. During questioning, the defendant confessed to the shooting.

The admissibility of a confession is initially a question of fact for the trial court. *State* v. *Madera,* 210 Conn. 22, 40, 554 A.2d 263 (1989); *State* v. *Schroff,* 206 Conn. 182, 195–96, 536 A.2d 952 (1988); *State* v. *Derrico,* 181 Conn. 151, 162–63, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). In view of the constitutional dimension of the issue, the trial court's finding of voluntariness is, however, subject to "an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence." *State* v. *Smith,* 200 Conn. 465, 478, 512 A.2d 189 (1986). We review the record in its entirety, and are not limited to the evidence before the trial court at the time the ruling was made on the motion to suppress. *Beckwith* v. *United States,* 425 U.S. 341, 348, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976); *State* v. *Toste,* 198 Conn. 573, 576, 504 A.2d 1036 (1986).

Our examination of the record relating to the interrogation reveals the following. The defendant was apprehended at his girlfriend's house, a few blocks away from where the police had begun the chase. He was arrested on a weapons charge and brought to the investigative services unit at New Haven police headquarters. The defendant told the arresting officer that he was fifteen years old, but by the time he was questioned had informed the officers of his correct age, seventeen. After the arrest, officers found that a man, Marlin Williams, had been shot to death at the site of the gunshots. The defendant was questioned, therefore, in connection with the victim's shooting.[3]

---

[3] The defendant was initially charged in a five count information with murder; General Statutes § 53a-54a; conspiracy to commit assault in the

The defendant was taken to the third floor of the police station and brought to a conference room adjoining the principal central room (the detective bureau) with tall windows looking to the outside and to the adjoining detective bureau. The room was fairly large with no "hot lights." There he was interrogated by patrol officer Joseph Pettola. Although other police officers came in and out and did ask the defendant questions, the interrogation was primarily one-on-one, between the defendant and Pettola. Pettola testified that the interrogation began at 8:30 p.m., while the defendant first testified that it began at 7 p.m., but then conceded that it might have begun later. The interview ended either between 11:30 p.m. and midnight (according to Pettola) or between 12:45 and 1 a.m. (according to the defendant). Both sides agree that the interrogation took at least three hours. After the interrogation was over, Pettola prepared his written report of the interrogation, which he dictated at 2 a.m.

I

THE DISPUTED EVENTS

What happened during the interrogation is the core of the dispute. The police officer, Pettola, testified as follows. Before the questioning began, he took out a combined "rights" card-waiver form[4] printed with stan-

---

first degree; General Statutes §§ 53a-59, 53a-48; carrying a pistol without a permit; General Statutes § 29-35; and unlawful discharge of firearms; General Statutes § 53-203. He was ultimately tried on a substitute information, which was amended, charging him with murder under General Statutes §§ 53a-54a (a) and 53a-8.

[4] The form was a sheet of paper with two sections. The first, entitled "WARNING," states: "You have the right to remain silent. If you talk to any Police Officer, anything you say can and will be used against you in a court of law. You have the right to consult with a lawyer before you are questioned, and may have him with you during any questioning. If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning. If you wish to answer questions you have the right to stop

dard language informing the arrestee of his *Miranda* rights.[5] He gave the form to the defendant to read and also read it aloud to him. At the suppression hearing, Pettola testified that he asked the defendant whether he knew how to read, but at trial, he testified that he did not recall so doing. He did not ask the defendant any questions about his level of education or his prior experience with the police.

After reading the defendant the first section of the form, which advised the defendant of his rights, Pettola went on to read him the waiver section. Pettola went through the waiver section line by line, and after each line, specifically asked the defendant whether he understood that right and whether he waived that right. Each time he was asked whether he understood the right and whether he waived it, the defendant answered "yes." Each time he answered "yes," Pettola asked him to initial the form, but the defendant refused, saying he would not sign anything. When asked if he wanted to make a written statement, he refused. When Pettola brought out a tape recorder and asked him if he wanted to make a recorded statement, the defendant said, "Nothing on tape." Yet, when asked if he would give an oral statement, the defendant said, "[I'll] do that." There were no witnesses other than Pettola to these responses. Although two or three police detec-

---

answering at any time. You may stop answering questions at any time if you wish to talk to a lawyer, and may have him with you during any further questioning." The second section, entitled "WAIVER," breaks the "warning" down into individual statements, each preceded by a line for the suspect to initial in acknowledgment. Following this section is the waiver, which states: "I am willing to answer questions and make this statement knowing that I have and fully understand these rights. I do not want a lawyer at this time. I do make the following statements without fear, threats or promises of favor, knowing that this statement can be used against me in a court of law." At the bottom of the form are signature and date lines.

[5] See *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

tives were present at times during the interrogation, Pettola did not recall whether any of them had witnessed the defendant's oral waiver of rights, and the detectives never testified on this subject at either the suppression hearing or the trial.[6]

After the defendant had agreed to make an oral statement, the questioning began. For approximately the next three hours, Pettola asked questions, and the defendant answered them. During the questioning, the defendant appeared calm and not intimidated. There was no indication that his mind was impaired by alcohol, drugs or any mental disability. First he gave exculpatory answers that Pettola in testimony referred to as "the wrong answers." Part way through the interview, however, the defendant began to explain his involvement in the killing. Once the defendant had given Pettola a story that Pettola found believable, because it was consistent with the information supplied by the arresting officers, the defendant said he would not answer any more questions, and the interview concluded.

At the suppression hearing, the defendant's version of the events differed materially from Pettola's. The defendant first testified that he was neither advised of his rights nor asked to waive them, that he was not shown a "rights" card/waiver form, and that he had refused to answer any questions. When the hearing resumed after a recess, however, he changed his testimony. This time, he said that he was shown a waiver form, although it was not read to him, and that he was asked to sign it, but refused. He also said that he knew his rights from prior experience, which he described as "do I want a lawyer or do I want to speak—do I have

---

[6] One of the officers, Michael Tullo, did testify, but not about the defendant's statement or waiver of rights.

to speak in front of my parent.'"[7] He testified that he had, in fact, answered some questions, but only to explain what he was doing in the area. He denied telling Pettola the names of his companions, although the defendant's companions had not been apprehended at the time Pettola prepared the report giving their names and addresses. He denied that Pettola ever offered him anything to eat or drink, but never said that he had, in fact, been hungry, thirsty, tired, or fearful.

The defendant's version of events also differs from Pettola's in other respects. At the suppression hearing, the defendant testified that he had asked for a lawyer several times.[8] Pettola, on the other hand, testified that at no time did the defendant ask to speak to an attorney.

The defendant also testified, and Pettola did not dispute, that several times during the course of the interrogation the defendant asked to be allowed to telephone his mother. Precisely when he made each request is unclear, but there is no dispute that he made his requests several times throughout the interrogation.

---

[7] There was evidence at the suppression hearing that the defendant had been arrested twice before within the previous month, but there was no evidence that he had ever been interrogated or read his rights at those times, nor any evidence of the outcome of those arrests. More importantly, the defendant admitted that he had been in the police station before, had been on the same floor two years ago, and was familiar with the arresting officers from prior experience. Combined with the defendant's mother's testimony that she had had to call the police about her son before, that he had been in detention before, long enough to have visiting rights, and their apparent belief (despite the *Miranda* warnings) that interrogation required a parent's presence, these admissions suggest that the defendant may have had a history of arrests as a "child" under General Statutes § 46b-120 (discussed and cited in full at footnote 12, infra). Arrests of the defendant as a juvenile offender would not ordinarily appear on his record. See General Statutes § 46b-124 (a).

[8] This claim was not pursued; at oral argument, defense counsel explained that because the trial court disbelieved the defendant, he was barred from raising the claim.

Pettola expressly stated that the defendant never said he wanted to speak to his mother in order to ask her to get him an attorney, and the defendant did not contradict this point. The defendant never explained *why* he wanted to speak to his mother. The defendant also claimed Pettola told him he could be kept forty-eight hours without being allowed to talk to anyone, and that Pettola would let him call his mother when he told him what he wanted to hear. For his part, Pettola testified at trial that as a matter of New Haven police practice, an adult arrestee is not permitted to interrupt an interview to call anyone other than an attorney.

In addition to the defendant's own requests to telephone his mother, his mother attempted to call him. She testified at the suppression hearing that she had heard his name on the evening news and began calling the police station. She first simply asked the police whether her son was there and whether she could speak with him, but permission was refused. In a subsequent call, she told the police she wanted her son to speak to an attorney, but was informed that she would have to take care of that herself. She came to the station in person, but was not allowed to see her son. Finally, at 1:30 a.m., after the defendant's interrogation was over, he was allowed to call his mother. Between that telephone call at 1:30 a.m. on Friday morning, October 14, and the next day, October 15, when the defendant was released on bail, the defendant's mother did not visit him, call him, or attempt to find an attorney for him.

## II

### THE DEFENDANT'S REQUEST TO CALL HIS MOTHER

The defendant's argument focuses on Pettola's refusal to let him telephone his mother. We have never held that a minor in custody has the right to contact a parent, nor that contact with a parent is required

before a minor can effectively waive his *Miranda* rights. Indeed, we expressly rejected that suggestion in *State* v. *Oliver,* 160 Conn. 85, 94, 273 A.2d 867 (1970), cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115 (1971).[9]

The legislature has, however, chosen to provide minors under the age of sixteen with certain specific protections. Our statutes prescribe, that upon the arrest of a child, the police must notify the child's parents, and that any confession or admission made by a child without the presence of his parents is inadmissible in a delinquency proceeding. General Statutes §§ 46b-133 (e)[10] and 46b-137 (a).[11] These protections are, however, limited to a "child," defined in General Statutes § 46b-120 as any person under the age of sixteen.[12]

[9] In *State* v. *Green,* 207 Conn. 1, 540 A.2d 659 (1988), where a minor defendant charged with murder was separated from his father and questioned, we held only that separating the accused child from the parent constituted "taking into custody" so that the failure of the police to provide him with *Miranda* warnings violated his constitutional rights.

[10] "[General Statutes] Sec. 46b-133. (Formerly Sec. 51-314). ARREST OF CHILD. RELEASE OR DETENTION OF ARRESTED CHILD. . . . "(e) The police officer who brings a child into detention shall have first notified, or made a reasonable effort to notify, the parents or guardian of the child in question of the intended action and shall file at the detention center a signed statement setting forth the alleged delinquent conduct of the child. Unless the arrest was for a serious juvenile offense, the child may be released by a detention supervisor to the custody of his parent or parents, guardian or some other suitable person."

[11] "[General Statutes] Sec. 46b-137. (Formerly Sec. 51-318). ADMISSIBILITY OF CONFESSION OR OTHER STATEMENT IN JUVENILE PROCEEDINGS. (a) Any admission, confession or statement, written or oral, by a child shall be inadmissible in any proceeding for delinquency against the child making such admission, confession or statement unless made by such child in the presence of his parent or parents or guardian and after the parent or parents or guardian and child have been advised (1) of the child's right to retain counsel, or if unable to afford counsel, to have counsel appointed on the child's behalf, (2) of the child's right to refuse to make any statements and (3) that any statements he makes may be introduced into evidence against him."

[12] "[General Statutes] Sec. 46b-120. (Formerly Sec. 51-301). DEFINITIONS. The terms used in this chapter shall, in its interpretation and in the inter-

A decision to expand the scope of the exclusionary rule of § 46b-137 (a) requires the kind of interest balancing determination best left to the legislature. There are strong reasons to restrict the inadmissibility of confessions made in the absence of a parent to those of minors under sixteen, as the legislature has done in § 46b-137 (a). As we said in *In re Manuel R.*, 207 Conn. 725, 734, 543 A.2d 719 (1988), when we refused to adopt a per se rule that children *under* sixteen are incompetent to waive the assistance of counsel, "a per se rule of nonwaivability might actually frustrate a principal goal of juvenile law of encouraging children to accept responsibility for their transgressions and take an active role in their rehabilitation." Moreover, the presence of a parent is not necessarily an unmitigated benefit, even to a child. "[A]s judicial and scholarly authorities attest, parents may, for their own reasons, exert pressure on children to confess to alleged offenses and to waive the assistance of counsel. *United States* v. *Fowler*, 476 F.2d 1091, 1093 (7th Cir. 1973); *In re Matter of C.P.D.*, 367 A.2d 133, 134–35 (D.C. App. 1976); *Anglin* v. *State*, 259 So. 2d 752 (Fla. App. 1972); T. Grisso, [Juveniles' Waiver of Rights: Legal and Psychological Competence (1981), pp. 179–80]." Id., 739. We therefore decline to hold that a seventeen year old charged with murder must be afforded an opportunity to contact a parent before making a valid waiver of his rights to silence and counsel.

A different case would be presented had the defendant asked to telephone his mother *to ask her to obtain*

pretation of other statutes, be defined as follows: 'Child' means any person under sixteen years of age . . . ."

General Statutes § 46b-120 was amended in 1971 by Public Acts 1971, No. 72, § 14, to reduce the age limit on the definition of "child" from eighteen to sixteen; that amendment makes it clear that the legislature did not intend "youths," defined in § 46b-120 as those between the ages of sixteen and eighteen, to be afforded the same protections as "children" sixteen and under.

*an attorney for him.* The Pennsylvania Supreme Court has concluded that such a request should be considered an invocation of the fifth amendment right to counsel. See *Commonwealth* v. *Zook,* 520 Pa. 210, 216, 553 A.2d 920, cert. denied, 493 U.S. 873, 110 S. Ct. 203, 107 L.Ed. 2d 157 (1989). Upon any request for counsel, the interrogating officer must cease all questioning; *Rhode Island* v. *Innis,* 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *State* v. *Acquin,* 187 Conn. 647, 667, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983); and if the request is ambiguous, must clarify the suspect's wishes before resuming questioning. *State* v. *Shifflett,* 199 Conn. 718, 737, 508 A.2d 748 (1986). We are not asked to consider such a situation here. There is no evidence in the record, and the defendant does not claim, that the defendant actually told the officer he wanted to ask his mother to find him an attorney. There is no evidence that the defendant did in fact want his mother to find him an attorney.[13] Absent such evidence, we cannot assume that a seventeen year old youth's request to call his mother is equivalent to a request that his mother obtain counsel for him.

Unless he was actually requesting the assistance of counsel, the defendant had no constitutional right to interrupt the interrogation to talk to his mother. There is no fifth amendment right to parental advice. The United States Supreme Court has concluded that even a minor's request to speak to his parole officer is not an invocation of his fifth amendment right to counsel. *Fare* v. *Michael C.,* 442 U.S. 721, 99 S. Ct. 2560, 61 L. Ed. 2d 197, reh. denied, 444 U.S. 887, 100 S. Ct. 186, 62 L. Ed. 2d 121 (1979). The court's discussion

[13] The defendant's mother did not attempt to find him an attorney between the time she spoke to her son soon after midnight in the early morning of Friday, October 14, and the time of his release on bond on Saturday, October 15.

is particularly appropriate here. Reasoning that "[i]t is this pivotal role of legal counsel that justifies the per se rule established in *Miranda*, and that distinguishes the request for counsel from the request for a probation officer, a clergyman, or a close friend"; id., 722; the court in *Fare* concluded that extending the *Miranda* requirements to requests for a parole officer would " 'cut this Court's holding in that case completely loose from its own explicitly stated rationale.' " Id., 722–23. As we have said: "At a minimum, the presence of a lay parent or guardian, with no training in law, is no guarantee that a child will be fully informed or meaningfully represented. *K.E.S.* v. *State,* 134 Ga. App. 843, 847–48, 216 S.E.2d 670 (1975); *State ex rel. J.M.* v. *Taylor,* 276 S.E.2d 199, 203 (W. Va. 1981)." *In re Manuel R.,* supra, 725. Other courts considering similar cases have reached the same conclusion. See *State* v. *Hunt,* 150 Vt. 483, 555 A.2d 369 (1988) (nineteen year old's request to call his father was not an invocation of fifth amendment rights); see also *State* v. *Crowhurst,* 470 A.2d 1138 (R.I. 1984) (request to call wife was not invocation of fifth amendment rights to silence or counsel).

Besides arguing that asking for his mother was equivalent to requesting an attorney, the defendant maintains that his mother's call was equivalent to an attorney's call. The defendant contends that his mother's call to the police station, during which she told the police that she wanted her son to speak to an attorney, triggers the application of *State* v. *Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988).[14] In *Stoddard,* we held

[14] The state points out that the defendant did not raise the possible application of the Connecticut constitution in his initial motion to suppress and did not do so explicitly on appeal. Where such a fundamental issue as the right to counsel is at stake, it would be unduly technical for us to refuse consideration of a fully briefed state constitutional claim while already reviewing a claim brought under the federal constitution.

that the due process clause of the Connecticut constitution requires the police to inform a suspect of timely efforts *by counsel* to provide pertinent legal assistance. We do not read the holding in *Stoddard* to encompass "attempts *by others* to warn [the defendant] to say nothing to the police or to obtain legal assistance." (Emphasis added.) Id., 179–80 (*Shea, J.,* dissenting). We rejected such a broad reading, stating: "The right of *access to counsel* plays a special role in the validity of confessions. The assertion in the dissenting opinion that our judgment will open up a 'Pandora's Box' with respect to other kinds of conceivably helpful information therefore has no foundation." (Emphasis added.) Id., 169 n.5. Thus, *Stoddard* prohibited only "police interference in the attorney-client relationship." *Moran v. Burbine,* 475 U.S. 412, 467, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (Stevens, J., dissenting). Here, there was no such relationship. The defendant's mother could have procured an attorney for her son, and police would have had to honor that attorney's attempts to reach the defendant. She did not do so. Her advice was more akin to "an abstract offer to call some unknown lawyer" than the "concrete offer of [legal] assistance" that *Stoddard* protects. *State* v. *Stoddard,* supra, 168.[15]

## III

### THE DEFENDANT'S WAIVER OF HIS *Miranda* RIGHTS

The defendant's request to telephone his mother is only one element of his larger argument that his waiver

---

[15] It is not clear from the record whether his mother's calls actually preceded the defendant's inculpatory statements; Pettola could not recall, and the mother's first call must have been after 11:20 p.m., after she heard the news broadcast concerning her son's arrest. If her calls came *after* her son's confession, the *Stoddard* argument has no force. See *State* v. *Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988). Moreover, the present case differs significantly from *Stoddard* in that the police here made no attempt to mislead or deceive the caller, but plainly told her that her son was being interrogated and she could not speak with him.

of rights was involuntary. In evaluating whether the state has met its burden of proving that the defendant knowingly and voluntarily waived his rights, we may defer to the trial court's findings on subsidiary factual questions, as compared with the ultimate legal finding of voluntariness; see *Miller* v. *Fenton,* 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985) (subsidary factual questions, such as what police tactics were in fact used, fall within the purview of 28 U.S.C. § 2254 [d]); and we must defer to the trial court's resolution of questions of credibility, *State* v. *Madera,* supra, 37; *State* v. *Kuskowski,* 200 Conn. 82, 89, 510 A.2d 172 (1986). The sole issue for us to decide is whether, judging the record as a whole; *State* v. *Toste,* 198 Conn. 573, 581, 504 A.2d 1036 (1986); the state has proved waiver by the preponderance of the evidence. *Colorado* v. *Connelly,* 479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *Lego* v. *Twomey,* 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Derrico,* supra, 162.

The trial court expressly found that the defendant was given his *Miranda* warnings. The trial court also accepted Pettola's testimony as to what took place at the interrogation, including, presumably, Pettola's testimony that the defendant expressly stated he waived his rights.[16] The only remaining issue is whether that waiver was knowing and voluntary.

Whether a defendant has voluntarily waived his *Miranda* rights is determined by an analysis of the totality of the circumstances. *Fare* v. *Michael C.,* supra, 724–25. "This totality-of-the-circumstances approach is adequate to determine whether there has been a

---

[16] Unlike *State* v. *Wilson,* 183 Conn. 280, 439 A.2d 330 (1981), relied upon in the dissenting opinion, which dealt with a claim of an *implied* waiver of *Miranda* rights, there was evidence in the present case that the defendant *expressly* waived his rights and *expressly* agreed to make an oral statement.

waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Id., 725; see also *State* v. *Toste,* supra, 580–81 (criteria to be considered are: experience with the police and familiarity with warnings; intelligence, including I.Q.; age; education; vocabulary and ability to read and write in the language in which the warnings were given; intoxication; emotional state; mental disease, disorder or retardation). Where the trial court makes specific factual findings regarding these elements, those findings are entitled to deference so long as they are supported by substantial evidence, but where, as here, the trial court has made no specific findings, we must review the evidence and make our own determination of the circumstances surrounding the defendant's waiver of his constitutional rights.

The defendant testified that he knew his rights from past experience with the police, that he had been on the third floor of the same police station a couple of years before, and that he knew several of the officers involved from his prior experience. He had been arrested twice on misdemeanor charges within the previous month, (and possibly more often; see footnote 7, supra), and according to his mother's testimony, had previously been held in detention long enough to have visiting rights. He had not been drinking and did not use drugs. Pettola testified that the defendant appeared

calm, and not to be suffering from any emotional or mental disturbance. Although he was a minor, he was not a "child" according to the statute, but was seventeen years old. The defendant presented no evidence of mental or emotional impairment. He also failed to present any testimony that his educational achievement was less than average for his age. In *State* v. *Toste,* supra, we found that an adult with a sixth or seventh grade level of intelligence had effectively waived his rights. The defendant's assertion at the hearing that he had requested a lawyer—although disbelieved by the trial court—indicated his familiarity with his rights.

The defendant presented no evidence from which the court could infer police coercion.[17] Instead, he attempted to discredit the police officer's version of events. He argued that his failure to sign the waiver form or furnish a written statement was evidence that he had not waived his rights, as were his refusal to answer some of the questions, the length of the interrogation (approximately three hours), and his minority. We have previously held, however, that these considerations do not necessarily indicate an involuntary waiver. *State* v. *Simms,* 201 Conn. 395, 415, 518 A.2d 35 (1986) (minority); *State* v. *Shifflett,* supra, 732 (refusal to sign waiver); *State* v. *Jones,* 193 Conn. 70, 83–85,

---

[17] "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. . . . The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado* v. *Connelly,* 479 U.S. 157, 170, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). The trial court noted the dearth of evidence to support a claim of coercion at the conclusion of the suppression hearing, stating: "I didn't hear any evidence that would cause anyone to think there was anything coercive about the atmosphere or that his will to resist was overborne and things of that nature. He didn't testify to that. There was no such evidence. I understand it's the state's burden to prove that these things—this type of atmosphere didn't exist, but the evidence that was offered by the state, you know, tended to show that, and nothing contrary was shown."

475 A.2d 1087 (1984) (refusal to answer some questions). There may be strategic reasons for a defendant's refusal to sign anything without counsel while agreeing to speak without counsel. *Connecticut* v. *Barrett,* 479 U.S. 523, 530 n.4, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987). "We have noted that it is ' "a common experience of life that in many circumstances persons are willing to convey information orally but are reluctant to put the same thing in writing." ' *State* v. *Frazier,* [185 Conn. 211, 225, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982)], quoting *United States* v. *Cooper,* 499 F.2d 1060, 1062 (D.C. Cir. 1974). . . . A written and signed confession is obviously a more reliable form of evidence than the uncorroborated and often disputed testimony of the interrogating officers." *State* v. *Shifflett,* supra, 733. And a three hour interview, during which the interrogating officer left the room several times, is not in itself inherently coercive.

More troubling is the police officer's failure to obtain a witness to the defendant's oral waiver of rights and oral confession. While there may be places where a police officer has no convenient witness handy, a busy police station is not one of them. Our concern does not, however, reflect upon the correctness of the trial court's ruling, for it relates only to the credibility of the state's witness.[18] Simply put, the defendant argues

[18] We have previously upheld convictions that were based upon oral statements made by a defendant to a single police officer that had been challenged as violative of *Miranda.* See, e.g., *State* v. *Vitale,* 197 Conn. 396, 497 A.2d 956 (1985) (defendant's oral statement, made while confined in lieu of bond, to one correctional officer was admissible); *State* v. *Bartee,* 167 Conn. 309, 355 A.2d 250 (1974) (defendant's oral statement given to one police officer at his hospital bedside was admissible after the defendant, according to the officer, had orally waived his rights); see *State* v. *Kuskowski,* 200 Conn. 82, 510 A.2d 172 (1986) (verdict was based in part upon the defendant's oral confession to a single police officer; in addition, the court disbelieved the defendant's unsupported claim that he had requested an attorney before repeating the statement to other officers).

that the police officer's failure to have the defendant's waiver witnessed proves that the police officer was lying. This is a question of credibility, and as such, is for the trier of fact to determine. *State* v. *Madera,* supra, 37.

The absence of a second witness to a confession is not a ground upon which a reviewing court may overturn a trial court's determination of compliance with *Miranda.* Such a lack of corroboration, however, may result in exclusion of a confession by the trial court when other supporting evidence is also not presented. Even when the ruling admitting the confession is unassailable, the absence of testimony confirming that of a single witness to a confession may become highly significant with respect to the weight given to a confession by the arbiter of guilt. "A defendant has been as free since *Jackson* [v. *Denno,* 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964)], as he was before to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness. In like measure, of course, juries have been at liberty to disregard confessions that are insufficiently corroborated or otherwise deemed unworthy of belief." *Lego* v. *Twomey,* supra, 485–86.

Here, the defendant has not contested the sufficiency of the evidence against him, and the record contains other evidence that the defendant shot at the victim intentionally. In another case, having no witness to an

---

Outside the context of a confession, this court has held that a single witness is sufficient to support a finding of guilt beyond a reasonable doubt. "It is not uncommon for an accused to be found guilty upon identification by only the complaining witness, and 'it is not the law that corroboration is essential to the proof of guilt.' . . . The issue is not to be determined 'solely by counting the witnesses on one side or the other.' " (Citations omitted.) *State* v. *Hodge,* 153 Conn. 564, 573, 219 A.2d 367 (1966) (state's only evidence of the commission of the crime was testimony by a single federal agent that the defendant had sold him heroin).

oral confession obtained during a custodial interrogation at a busy police station might prove fatal to the state's credibility. We cannot say, however, that the trial court's and the jury's decision to believe the testimony of the police officer was unreasonable, especially in light of the inconsistencies in the defendant's testimony and his statements to the arresting officer, including his lie about his age. See *State* v. *Kuskowski*, supra (trial court had the right to disbelieve the defendant's unsupported statement that he requested counsel when the state's evidence was that his rights had been read to him, he had understood them, and he had agreed to cooperate).

Given the absence of any evidence of police coercion and the trial court's finding that Pettola's testimony was credible, we conclude that the state has proved, by a preponderance of the evidence, that the defendant's waiver was knowing and voluntary. The defendant had prior experience with the police; his faculties were unimpaired; he was an older youth, not a young child; and the interrogation took only a few, interrupted hours.

Accordingly, we affirm the judgment.

In this opinion CALLAHAN and HULL, Js., concurred.

GLASS, J., with whom PETERS, C. J., joins, dissenting. It cannot be emphasized too much that it is our legal procedure that so magnificently assures the fundamental values of our legal system and satisfies our sense of fairness when our liberty is at stake. See *Shaughnessy* v. *Mezei*, 345 U.S. 206, 224–25, 73 S. Ct. 625, 97 L. Ed. 956 (1953) (Jackson, J., dissenting); *State* v. *Boyd*, 214 Conn. 132, 141 n.11, 570 A.2d 1125 (1990). This case, however, is singularly fraught with shoddy police procedure. Aside from the uncorroborated state-

ment of Officer Joseph Pettola, there is not "one scintilla of evidence" to support the youth's waiver of his *Miranda* rights. See *State* v. *Wilson,* 183 Conn. 280, 286, 439 A.2d 330 (1981).

The majority concedes that they are troubled by "the police officer's failure to obtain a witness to the defendant's oral waiver of rights and oral confession." The majority notes further that while "there may be places where a police officer has no convenient witness handy, a busy police station is not one of them." Nonetheless, the majority is willing to uphold the admission of the "confession" into evidence, thus giving the sanction of this court to the procedure by which the "confession" was obtained. Specifically, the majority quells its concern by concluding that the issue of the lack of corroboration of the youth's alleged waiver of his *Miranda* rights relates only to the credibility of Pettola, and not to the correctness of the trial court's ruling. Because I disagree with that conclusion, my concerns have not been quelled, and, therefore, in this one-on-one swearing contest between the police officer and the youth, I am unable to conclude that there is "substantial evidence" to support a waiver of *Miranda* rights. Accordingly, I respectfully dissent.

It is well settled law that the "state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his *Miranda* rights, including his right to remain silent." *State* v. *Barrett,* 205 Conn. 437, 449, 534 A.2d 219 (1987). "Waiver has been defined as 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). ' "[C]ourts indulge every reasonable presumption against waiver" of fundamental constitutional rights [and] "do not presume acquiescence in the loss of fundamental rights." ' *Id.*;

*State* v. *Shockley,* 188 Conn. 697, 707, 453 A.2d 441 (1982). 'An effective waiver presupposes full knowledge of the right or privilege allegedly waived and some act "done designedly or knowingly to relinquish it." ' *State* v. *Ramos,* 201 Conn. 598, 603, 519 A.2d 9 (1986); *State* v. *Toste,* [198 Conn. 573, 630, 504 A.2d 1036 (1976)]." *State* v. *Madera,* 210 Conn. 22, 48, 554 A.2d 263 (1989). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' *Johnson* v. *Zerbst,* [supra, 464]." *North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).

" 'The courts must presume that [the] defendant did not waive his rights; the prosecution's burden is great . . . .' *North Carolina* v. *Butler,* [supra, 373]; *State* v. *Wilson,* supra, 284. 'Although the issue is . . . ultimately factual, our usual deference to factfinding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. *State* v. *Frazier,* [185 Conn. 211, 219, 440 A.2d 916 (1981)]." *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983); *State* v. *Chung,* [202 Conn. 39, 48–49, 519 A.2d 1175 (1987)]; *State* v. *Wilson,* supra, 286. . . . In considering the validity of this waiver, we look . . . to the totality of the circumstances of the claimed waiver. See *State* v. *Chung,* supra, 48; *State* v. *Simms,* 201 Conn. 395, 415, 518 A.2d 35 (1986)." *State* v. *Madera,* supra, 48–49.

The majority states: "Simply put, the defendant argues that the police officer's failure to have the defendant's waiver witnessed proves that the police officer was lying. This is a question of credibility, and

as such, is for the trier of fact to determine. *State* v. *Madera,* supra, 37." The majority ignores, however, the fact that the trial court's ruling in such situations must be "supported by substantial evidence." See id., 49; *State* v. *Chung,* supra.

In *State* v. *Wilson,* supra, this court held that the trial court incorrectly admitted evidence of the defendant's oral confession when there was "not one scintilla of evidence of any verbal or physical indication by the defendant that he either wanted to waive or did, in fact, waive his rights. . . . The only fact from which waiver might [have] conceivably [been] inferred [was] the actual speaking of the inculpatory remarks by the defendant; but that [was] not enough. A valid waiver cannot be presumed 'simply from the fact that a confession was in fact eventually obtained.' *Miranda* [v. *Arizona,* 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]." Id., 286. In *State* v. *Madera,* supra, the case that the majority cites for the proposition that this is a question of credibility for the trier of fact to determine, this court was faced with a scenario similar to *Wilson.* In particular, the defendant claimed that he had not been advised of his *Miranda* rights. The trial court, however, found "overwhelming evidence" supporting the state's assertion that the defendant had indeed been so advised. This court then upheld the trial court's finding, specifically noting that, in reaching its conclusion, the trial court referred to the testimony of *five* police officers and *one* assistant state's attorney, who all testified that the defendant had been advised of his *Miranda* rights. Id., 37.

In the present case, we have a scenario that falls in between *Wilson* and *Madera.* In looking, however, to "the totality of the circumstances of the claimed waiver"; *State* v. *Madera,* supra, 49; I conclude that this case is closer in nature to *Wilson* than it is to

*Madera.* The only evidence before the trial court indicating that the youth waived his *Miranda* rights was the uncorroborated testimony of Pettola. It is my belief that, when "the particular facts and circumstances" of this case are considered, the more rational interpretation of the evidence indicates that the state did not meet its burden of proving that the youth made a "knowing and intelligent" waiver of his *Miranda* rights.

First, it can be argued that, since the youth refused to sign a written waiver or to give a written or tape-recorded statement, yet eventually was willing to give an oral statement, he clearly did not understand that his oral statement could be used against him just as any written or recorded statements could be. Moreover, additional circumstances surrounding this case cry out against this court's sanctioning of the procedure utilized by the police. A youth was brought into the police station around 8:30 p.m. During his questioning, that lasted for at least three hours, he persistently requested that he be allowed to call his mother. The police, however, not only refused his requests, but also refused his mother's requests to speak to him. Eventually, the youth allegedly orally waived his *Miranda* rights and confessed to murder. Pettola alone took the youth's oral waiver and confession, notwithstanding the fact that he testified that it is usual police procedure to have another officer present to witness an oral waiver of *Miranda* rights after a suspect has refused to sign a written waiver form. Moreover, other police officers could be seen from the interrogation room and were coming in and out of the interrogation room on a regular basis.

Because Pettola failed to, at the very least, have the youth's oral waiver and confession witnessed by another police officer, this case must be determined on the basis of Pettola'a uncorroborated statement and

the contradicting testimony of the youth. I am unable, under the circumstances of this case, to find "substantial evidence" of the youth's waiver of his *Miranda* rights as is required by our case law.

Moreover, I take issue with the majority's utilizing the jury's verdict in this case as further support of the trial court's ruling at the suppression hearing. The majority states: "In another case, having no witness to an oral confession obtained during a custodial interrogation at a busy police station might prove fatal to the state's credibility. We cannot say, however, that the trial court's and *the jury's* decision to believe the testimony of the police officer was unreasonable . . . ." (Emphasis added.) While it is true that, in reviewing the trial court's ruling at a suppression hearing, this court is not limited to the *evidence* that was before the trial court; *State* v. *Toste,* supra, 576; I do not, however, consider the jury's verdict to be "evidence." To do so would condone the unsettling practice of using a jury's verdict as a curative force in regard to a trial court's evidentiary ruling.

For the foregoing reasons I respectfully dissent.