[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO SUPPRESS 
On or about May 31, 2000, the respondent, La'Charles G., a juvenile, was arrested for alleged violations of General Statutes § 53a-70, sexual assault in the first degree, and General Statutes § 53-21, risk of injury to a minor.
On October 19, 2000, La'Charles filed a motion to suppress all statements, admissions or confessions, written or oral, he made regarding CT Page 70 the alleged offenses at the headquarters of the Hartford police department on May 31, 2000. The grounds of the motion are that such statements were obtained in violation of the rights provided to the respondent by the fifth, sixth and fourteenth amendments to the United States Constitution and General Statutes § 46b-137 because the statements were made without counsel or a parent present and without properly advising La'Charles of his rights.
A hearing on the motion was held on November 17, November 29 and December 11. The juvenile prosecutor and public defender also submitted briefs after the conclusion of the hearing. For the following reasons, the court denies the motion to suppress.
1. Facts
On May 31, 2000, Hartford police detectives Steven DiBella and Frances Watson were assigned to investigate a complaint of a sexual assault on an eleven year old girl. The initial report had come from personnel at the St. Francis Hospital Children's Advocacy Center. After interviewing the girl and her mother at the hospital, the detectives determined the alleged perpetrator to be La'Charles, the girl's fourteen year old nephew. La'Charles' father, Charles G. Jr., is the girl's half brother. At the time of the alleged incident, La'Charles and Charles Jr., who are permanent residents of South Carolina, were residing with the girl's parents for the summer months at 59 Loomis Street in Hartford while Charles Jr. worked as a roofer.
DiBella and Watson left, St. Francis and went to 59 Loomis Street, where they located with La'Charles and Charles Jr. Prior to the arrival of the police, the girl's mother had advised Charles Jr. that La'Charles could no longer stay at their home, and Charles Jr. admits that he had been made aware that the girl had alleged inappropriate "touching" by La'Charles. Charles Jr. agreed to bring La'Charles to the police station to discuss the alleged incident. The detectives drove to police headquarters and La'Charles and Charles Jr. followed in a separate vehicle driven by Charles Jr. When the four of them arrived at the police station, they proceeded to the office of the Youth and Family Services Division.
In an interviewing room designed to put children at ease, DiBella, while everyone was seated, produced a pre-printed advisement and waiver form with the Miranda rights[1] on it and showed it to La'Charles in the presence of Charles Jr. and Watson. The text of the form is clear and uncomplicated. At the top of the form, La'Charles, in his own hand, indicated his name, age, date of birth, last school attended and grade completed. He further indicated that he could read and write. DiBella CT Page 71 then read the warnings and waiver to La'Charles and Charles Jr. After each of the warnings, DiBella asked both of them if they understood the particular rights expressed, and when each indicated his understanding, La'Charles was asked to write his initials on the form on a line adjacent to the point where each right was described. La'Charles then signed the advisement and waiver form, and his signature was witnessed by Charles Jr. and DiBella. Both La'Charles and his father indicated that they understood the rights and the waiver described in the form.[2]
Subsequent to the signing of the advisement and waiver form, La'Charles and Charles Jr. agreed that La'Charles could be interviewed. La'Charles was asked to provide the detectives with his version of the events relative to the girl's allegations. La'Charles, encouraged by his father to tell the truth, made an inculpatory oral statement in the presence of his father, DiBella and Watson. Although La'Charles was understandably uncomfortable, for a period of approximately 25 minutes, he answered DiBella's questions calmly and did not have a great deal of difficulty in stating the facts as he remembered them.
DiBella then suggested that La'Charles put his statement in writing. La'Charles and his father agreed La'Charles would do so. Watson had left the room to take a call, but while Charles Jr. and DiBella were still present, DiBella explained to La'Charles how to fill out the top part of a Voluntary Statement form, and La'Charles filled it in. Then, while La'Charles proceeded to write out a confession in his own hand, DiBella, and subsequently, Charles Jr. left the interview room and waited in an adjacent office area. Although Charles Jr. was visibly upset and pacing after what he heard La'Charles relate to the police, he was able to engage in small talk with Watson, DiBella and Sargent William Long while La'Charles finished writing. During this time, a period of approximately 15 minutes, the door to the interview room where La'Charles worked alone remained open. No one prevented access between La'Charles and Charles Jr. In fact, Charles Jr. went back into the interview room while the boy was still writing and came back out to indicate to the police that his son was finished. The brief written statement was retrieved by DiBella and read aloud in the presence of La'Charles, his father, DiBella and Long. After all four had reviewed the statement, Long asked La'Charles to reread the statement, and then asked him if he agreed with it or wanted to add anything. Long also advised La'Charles of the consequences of making a false statement and took his oath. La'Charles did not indicate he wished to make any changes. He then signed the statement twice in the presence of DiBella, Long and Charles Jr. Long notarized LaCharles' signatures and DiBella and Charles Jr. witnessed them. The written statement was substantially similar to the oral statement La'Charles had made earlier. CT Page 72
During the making of the oral and written statements, neither La'Charles nor Charles Jr. asked to stop, nor did either request to speak with an attorney. There is no evidence of any fraud, threats or promises made by any members of the police department to induce La'Charles' statements, nor was trickery employed. In fact, when Charles Jr. indicated at Loomis Street that he and his son wanted to be cooperative, the detectives did everything possible to make the situation as comfortable as possible for both father and son.
After the written statement was completed, DiBella explained to Charles Jr. that La'Charles was going to be arrested and detained at the juvenile detention center in Hartford. Charles Jr. also was provided with directions to the juvenile court and informed he would need to be at court the next morning. La'Charles and Charles Jr. waited calmly while DiBella typed up a report for the prosecutor. Charles Jr. remained cooperative and never acted surprised or angry when informed that his son was to be detained. He did ask where he could find something to eat on the way home, as it was late in the evening.
 2. Legal Analysis 
In order for the statement of an accused juvenile to be admitted, it must be made in strict compliance with General Statutes § 46b-137, which requires that any admission, confession or statement, written or oral, made by a child to a police officer be made by the child in the presence of his parent and after the parent and child have been advised of the right to counsel and the right to remain silent. In ascertaining the voluntariness of the waiver by a juvenile of his Miranda rights, a court should inquire into the" `juvenile's age, experience, education, background and intelligence and into whether he has the capacity to understand the warnings give him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' "State v.Whitaker, 215 Conn. 739, 754, 578 A.2d 1031 (1990), quoting Fare v.Michael C., 442 U.S. 707, 725, 99 S.Ct. 21560, 61 L.Ed.2d 197 (1979); see also State v. Perez, supra, 218 Conn. 714, 728.
There seems to be no dispute that La'Charles was in custody from the time he and Charles Jr. left Loomis Street, but the onset of police custody is not an issue because no one has suggested La'Charles made any statement until after he and Charles Jr. went to the police station and were fully advised of La'Charles' rights in a thoroughly clear and non-intimidating fashion. DiBella carefully read La'Charles and Charles Jr. a form which provides a detailed, concise and simple statement of all of the rights § 46b-137 mandates be disclosed to a juvenile. La'Charles initialed each and every right after it was read aloud and both he and his father indicated to DiBella they understood the rights CT Page 73 being waived. In fact, the sufficiency of the reading and signing of the waiver of rights form really is not disputed by the respondent.[3]
There has been no evidence or claim that La'Charles did not have sufficient command of English, written or spoken, nor is there any suggestion of intoxication or mental or emotional impairment on the evening of May 31. La'Charles, 14 years of age at the time, had an eighth grade education and a command of the English language proficient enough to draft his own straightforward statement. The evidence indicates that La'Charles remained calm throughout the process. His initials and signatures on both the waiver of rights form and the written confession are clear and legible. The police scrupulously followed proper procedure in warning him, in his father's presence, of his rights and in obtaining a written waiver of those rights prior to questioning him.
The primary argument for suppression discussed in the respondent's brief, citing In re Robert M., 22 Conn. App. 53, 576 A.2d 549 (1990), is that La'Charles made an oral statement only after Charles Jr. was asked to leave the room. La'Charles further argues that his father was prevented from any opportunity to review the contents of his son's oral or written statements or discuss them with him. This version of what occurred is not credible and contradicts the consistent testimony of three police officers. If Charles Jr. was completely unaware of the contents of either statement, how did he manage to show no signs of hostility or surprise when informed his son had just confessed to a serious crime serious enough to warrant his detention?
The state has met its burden of proving by a fair preponderance of the evidence that the two statements were made after a voluntary, knowing and intelligent waiver and that both the waiver and the statements were made in the presence of the juvenile's parent. La'Charles and Charles Jr. were together in the interview room when the advisement was given, the waiver was signed, and the oral statement was made. They both indicated they understood La'Charles' rights and both agreed La'Charles could be interviewed and answer questions without the presence of counsel. After describing what transpired orally, La'Charles and his father agreed La'Charles would execute a written statement. La'Charles began writing while DiBella and his father were still present. During the fifteen minutes La'Charles worked, DiBella, then Charles Jr., left the room. Charles Jr. remained in the adjacent office area, never far from the boy. The door to the room where the boy worked remained open and if he had wanted to call to his father, his father was in a position to hear him. He was, at all times, aware of his father's presence and he could have requested his advice or intervention at any time. At all times, the boy and his father had access to one another and no one prevented any access. CT Page 74
Eventually, Charles Jr. went back into the room without a police officer and came back out and pronounced the statement ready. The written statement, retrieved by DiBella, was read aloud in the presence of La'Charles and Charles Jr. before La'Charles signed it twice. The father witnessed his son's signatures. Under the totality of the circumstances, Charles Jr. was present as required by § 46b-137 when both inculpatory statements were made. At no time was the father prevented from observing the situation to insure his son was not being coerced, nor is there any evidence of coercion.
In this case, the parental presence is greater than the presence of the juvenile's mother in the case of In re Jonathan M., 46 Conn. App. 545,700 A.2d 1370 (1997). LaCharles' father leaves the room only when his son is silently and independently preparing his statement, and throughout this time the juvenile and parent were not prevented access to one another. In the case of Jonathan M., his mother is not present in the room for the an interrogation or the making of an oral statement, but the court finds the police acted properly under the circumstances because she was not prevented from hearing what transpired and Jonathan could have called for her. Supra, 551. Throughout the time Charles Jr. is not in the room with his son, when La'Charles is silently and independently preparing his written statement, no police are in the room either, and no further interrogation was conducted in Charles Jr.'s absence.
The version of events the defense wants the court to accept does not make sense when one takes into account the relationship of the complainant to the alleged perpetrator and the fact that the father admits he recalls having been advised, prior to the police involvement, of an allegation that his son had touched the girl inappropriately. Charles Jr. had been told by his stepmother that given the seriousness of the incident, La'Charles could no longer reside at 59 Loomis Street. It would seem totally derelict for a father to witness his son's written statement when he has no knowledge of its contents. It is more plausible to conclude that Charles Jr. heard the oral statement and felt comfortable allowing his son to craft his written version independently. Although Charles Jr. claims some degree of reading impairment, the extent of which is unclear, he did listen to the oral statement and was present when the contents of the completed written statement were read aloud before La'Charles signed it. Under these circumstances, Charles Jr. was present as required by § 46b-137 while the two substantially similar inculpatory statements were made.
In this case, the detectives present acted compassionately, appropriately and in full conformance with the law in obtaining both statements. CT Page 75
Accordingly, the motion to suppress is denied.
KELLER, J.